**F I L E D**
**Tenth Circuit**

**PUBLISH**

**October 31, 2005**

# UNITED STATES COURT OF APPEALS
## TENT CIRCUIT

ROBERT W. SCHRIER, M.D.,

     Plaintiff-Appellant,

v.

UNIVERSITY OF COLORADO, ELIZABETH HOFFMAN, in her official capacity as President of the University of Colorado; RICHARD D. KRUGMAN, M.D., in his official capacity as Dean of the University of Colorado Health Sciences Center; JAMES H. SHORE, M.D., in his official capacity as Chancellor of the University of Colorado Health Sciences Center,

    Defendants-Appellees.

_____

THE AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS,

    Amicus Curiae.

No. 03-1275

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 02-MK-2366)**

---

James M. Lyons (Kris J. Kostolansky and Craig R. Welling, with him on the briefs) of Rothgerber Johnson & Lyons LLP, Denver, Colorado, for Plaintiff-Appellant.

Thomas S. Rice of Senter Goldfarb & Rice LLC, Denver, Colorado (David P.

Temple, Special Assistant Attorney General, University of Colorado, Denver, Colorado, with him on the briefs), for Defendants-Appellees.

Donna R. Euben and Ann D. Springer of American Association of University Professors, Washington, D.C., and Seth A. Tucker and Edward M. Mathias of Covington & Burling, Washington, D.C. (Professor David M. Rabban, University of Texas School of Law, Austin, Texas, and Professor Robert M. O'Neil of University of Virginia School of Law, Charlottesville, Virginia, Of Counsel with them on the brief) filed a brief for Amicus Curiae.

---

Before **MURPHY, McKAY,** and **SEYMOUR**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

---

Dr. Robert W. Schrier, M.D., a Professor of Medicine at the University of Colorado (University), filed a civil action in Colorado state court against the University and three of its employees, President Elizabeth Hoffman, Dean Richard D. Krugman, M.D., and Chancellor James H. Shore, M.D., in their official capacities. Mr. Schrier's complaint alleges that defendants' termination of his appointment as Chair of the University's Department of Medicine in retaliation for his acts of speaking publicly about a matter of public concern violated his constitutional rights pursuant to 42 U.S.C. § 1983 and constituted a breach of contract. Defendants removed the suit to federal court pursuant to 28 § U.S.C. 1441. Subsequent to removal, Dr. Schrier filed a motion for a temporary restraining order and preliminary injunction seeking reinstatement as Chair of the

Department of Medicine. The magistrate judge, designated pursuant to 28 U.S.C. § 636(c) by consent of the parties, denied Dr. Schrier's motion and this appeal followed. While we disagree with certain legal conclusions reached by the court below, in the final analysis we nonetheless affirm denial of the injunction.

## I

The University of Colorado is comprised of four campuses, one of which is the Health Sciences Center. In turn, the Health Sciences Center embraces five schools, one of which is the School of Medicine. The School of Medicine consists of twenty-four Department Chairs, eight Basic Science Departments, and sixteen Clinical Departments, including the Department of Medicine.

Dr. Schrier, a nephrologist and medical academician, was appointed Professor of Medicine in the School of Medicine on or about July 1, 1972. He received continuous tenure and was subsequently appointed Head of the Renal Division of the Department of Medicine. In 1976, the doctor was appointed Chair of the Department of Medicine, the largest department within the School of Medicine. Department Chairs are responsible for the organization of their department and for implementing policies initiated by the Chancellor and Dean of their respective units. Dr. James Shore became Chancellor of the Health Sciences Center in 1985 and Dr. Richard Krugman has served as Dean of the School of

Medicine since 1992.

In the mid-1990s, the University began considering the possibility of moving the Health Sciences Center, then located at Ninth Avenue and Colorado Boulevard in Denver, Colorado, to a campus to be established at the former Fitzsimons Army Medical Center in Aurora, Colorado. In October 1998, the University's Board of Regents approved the move. It is undisputed that the possibility of the transition of the Health Sciences Center from its Ninth Avenue location to Fitzsimons was the subject of extensive debate within the University community.

Dr. Schrier concedes he has been an active participant in that debate since the initial announcement of the move proposal. He also maintains that his concerns about whether and how the Health Sciences Center should be migrated to the Fitzsimons site have evolved over time, as we detail more fully below. As summarized in the magistrate judge's findings of fact, "[b]oth before and after the Regents' approval [of the move], Dr. Schrier expressed to the University community and to others his concerns about the fiscal implications of the move and his view that the move would disrupt integrated programs within the School of Medicine." Aplt. App., vol. I at 187.

On October 10, 2002, upon receipt of approval from Chancellor Shore, Dean Krugman summarily removed Dr. Schrier from his position as Chair of the

Department of Medicine. The University maintains that Dean Krugman was not required to consult with faculty before dismissing Dr. Schrier because Department Chairs within the School of Medicine serve at the will of the Dean. Moreover, the University asserts that the termination of a Department Chair appointment does not constitute a disciplinary action and, as a result, has no effect on the terminated Chair's faculty position. Thus, Dr. Schrier retained his tenured appointment as faculty member and full professor of medicine within the University and currently draws a salary identical to the one he received as Chair.

The termination of his chairmanship prompted Dr. Schrier to file suit in the District Court for the City and County of Denver. In his complaint, Dr. Schrier alleges that the University's decision to remove him as Chair of the Department of Medicine in retaliation for publicly speaking out about the Fitzsimons move constitutes a deprivation of his constitutional rights as well as a breach of his employment contract. Defendants removed the action to federal court where the doctor filed a motion for a preliminary injunction seeking reinstatement as Chair pending the resolution of his claims on the merits. Upon conclusion of a three and a half day evidentiary hearing, the court issued an order denying Dr. Schrier's motion.[1]

---

[1]Dr. Schrier also argued that defendants' decision to terminate him as Chair without cause or a hearing violated his right to due process under the Fourteenth

(continued...)

On the basis of three separate theories, Dr. Schrier contends the court's order requires reversal. He claims that (1) the application of a heightened standard to his preliminary injunction motion constitutes reversible error; (2) the conclusion that the University's interest in suppressing his speech outweighed his First Amendment rights was contrary to the balancing test established in *Pickering v. Board of Education*, 391 U.S. 563 (1968); and (3) the court's *sua sponte* invocation of Eleventh Amendment immunity to bar his breach of contract claim was spurious and should be reversed. We address each argument in turn.

## II

### *Preliminary Injunction Standard*

We review the decision to deny a motion for a preliminary injunction for abuse of discretion. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003); *see also Ashcroft v. Am. Civil Liberties Union*, 124 S. Ct. 2783, 2790 (2004) ("This Court, like other appellate courts, has always applied the abuse of discretion standard on the review of a preliminary injunction." (quotation omitted)). "The standard for abuse of discretion is high. The state must show

---

[1](...continued)
Amendment. The magistrate judge held that Dr. Schrier failed to establish a likelihood of success on the merits of his due process claim. *See* Aplt. App., vol. I at 200. Dr. Schrier has not raised a due process claim on appeal.

that the district court committed an error of law (for example, by applying the wrong legal standard) or committed clear error in its factual findings." *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1205 (10th Cir. 2003) (citing *Kiowa Indian Tribe of Okla. v. Hoover*, 150 F.3d 1163, 1165 (10th Cir. 1998)). We have also described abuse of discretion as "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *See, e.g., Coletti v. Cudd Pressure Control*, 165 F.3d 767, 777 (10th Cir. 1999) (quotation omitted).

"As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991) (citation omitted); *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888-89 (10th Cir. 1989) ("Because it constitutes drastic relief to be provided with caution, a preliminary injunction should be granted only in cases where the necessity for it is clearly established."). In order to be entitled to entry of a preliminary injunction pursuant to FED. R. CIV. P. 65, the moving party must establish that:

> (1) [he or she] will suffer irreparable injury unless the injunction issues; (2) the threatened injury . . . outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood [of success] on the merits.

*Heideman*, 348 F.3d at 1188 (quoting *Resolution Trust Corp. v. Cruce*, 972 F.2d

1195, 1198 (10th Cir. 1992)); *see also Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001).

Because the limited purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), we have "identified the following three types of specifically disfavored preliminary injunctions . . . : (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004) (*en banc*) (internal citations and quotations omitted), *cert. granted sub nom on other grounds, Gonzales v. O Centro Espirita Beneficiente Uniao Do Vegetal*, 125 S. Ct. 1846 (2005). Such disfavored injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro*, 389 F.3d at 975.

Dr. Schrier concedes the magistrate judge correctly articulated the four factor test he was obligated to satisfy in order to be entitled to a preliminary injunction. He disagrees, however, with the court's conclusion that the requested relief is disfavored and thereby warrants a heightened standard of proof.

Specifically, Dr. Schrier maintains that because the injunction he seeks preserves rather than disturbs the status quo and is prohibitory as opposed to mandatory, it was erroneous for the court to require him to prove that each of the four preliminary injunction factors weighed "heavily and compelling" in his favor.

Relying on our decision in *SCFC ILC, Inc.*, the magistrate judge's order declared:

> [t]he following kinds of preliminary injunctions are disfavored: (1) that disturb the status quo; (2) that are mandatory as opposed to prohibitory; and (3) that afford the movant substantially all the relief he may recover at the conclusion of a full trial on the merits. A movant seeking these kinds of injunctions must show that the four factors weigh heavily and compelling in his favor.
>
> Mandatory injunctions "affirmatively require the nonmovant to act in a particular way." Injunctions that disturb the status quo alter the parties existing relationship. "The status quo is not defined by the parties' existing *legal rights*; it is defined by the *reality* of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights."
>
> Dr. Robert Schrier seeks to be reinstated to his former position as Chair of the Department of Medicine. Reinstatement would disturb the status quo and would require that I enter an injunction mandatory in nature. Consequently, Dr. Schrier must show that the [four preliminary injunction] factors weigh *heavily and compellingly* in his favor . . . .

Aplt. App., vol. I at 185-86 (emphases in original) (citations omitted).

Defendants contend the court's application of the "heavily and compelling" standard should be affirmed because "the injunction Dr. Schrier seeks would alter the status quo by removing the Interim Chair who replaced Dr. Schrier prior to this litigation, as well as end the ongoing search for a permanent Chair." Aple.

Br. at 46-47. They also maintain the injunction warrants a heightened standard because it is mandatory. According to defendants, "reinstatement would place the court in position where it may have to provide supervision," and "[r]einstatement would be disruptive and detrimental to the essential functioning of University business." *Id.* at 48. Thus, the threshold issue we are tasked with resolving is whether Dr. Schrier's requested reinstatement as Chair disturbs the status quo and/or is mandatory, or merely preserves the status quo and is prohibitory. *See O Centro*, 389 F.3d at 979.

Both defendants and the magistrate judge misunderstand the legal distinction between injunctions that disturb the status quo and those that do not. We have "explained that the status quo is 'the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing.'" *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001) (quoting *SCFC ILC, Inc.*, 936 F.2d at 1100 n.8). "In determining the status quo for preliminary injunctions, this court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." *Id.* In the instant case, the "last peaceable uncontested status existing between the parties before the dispute developed," 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2948, at 136 (2d ed. 1995), was on October 9, 2002, when Dr. Schrier was still serving as Chair of the

-10-

Department of Medicine, a position he had held in excess of twenty-six years. Dr. Schrier's request that he be reinstated as Chair seeks to preserve rather than disturb the status quo, regardless of whether or not he is legally entitled to such reinstatement. As such, it was erroneous for the magistrate judge to conclude that Dr. Schrier's injunction was disfavored on the basis that it alters the status quo.

Dr. Schrier further contends that the injunction he seeks is prohibitory rather than mandatory because it "requires the University to do nothing more than continue to do something it was already doing during the last uncontested period preceding the injunction, *i.e.*, permitting Dr. Schrier to retain his Chairmanship until the litigation is resolved on the merits." Aplt. Br. at 45 (internal quotation marks omitted). As we have recently made clear, however, injunctions are not necessarily prohibitory merely because they preserve the status quo. *O Centro*, 389 F.3d at 979. "Although mandatory injunctions also *generally* alter the status quo, that is not always the case. It is not at all difficult to envision situations where a mandatory injunction would preserve the status quo and a prohibitory injunction would alter the status quo." *Id*. *Cf*. WRIGHT, ET AL., *supra*, § 2948, at 135 ("it has long been established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the status quo" (quoting *Porter v. Lee*, 238 U.S. 246, 251 (1946)).

"There is no doubt that determining whether an injunction is mandatory as opposed to prohibitory can be vexing." *O Centro*, 389 F.3d at 1006 (Seymour, J., dissenting in part). Indeed,

> [t]he distinction between mandatory and prohibitory injunctions . . . cannot be drawn simply by reference to whether or not the *status quo* is to be maintained or upset. As suggested by the terminology used to describe them, these equitable cousins have been differentiated by examining whether the non-moving party is being ordered to perform an act, or refrain from performing. In many instances, this distinction is more semantical than substantive. For to order a party to refrain from performing a given act is to limit his ability to perform any alternative act; similarly, an order to perform in a particular manner may be tantamount to a proscription against performing in any other.

*Id*. (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025-26 (2d Cir. 1985), *overruled on other grounds by O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 n.2 (1987)). We characterize an injunction as mandatory if the requested relief "affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction." *Id*. at 979 (quoting *SCFC ILC, Inc.*, 936 F.2d at 1099). While merely seeking restoration of the status quo, Dr. Schrier's requested relief nonetheless "affirmatively require[s] the [University] to act in a particular way," *id*., that is, to reinstall him as Chair of the Department of Medicine. Moreover, we agree with defendants that "reinstatement would place the court in position where it may have to provide supervision." Aple. Br. at 48. Thus, the relief sought here is properly

-12-

characterized as mandatory and, as a result, constitutes a specifically disfavored injunction.

Notwithstanding our conclusion that the requested injunctive relief is mandatory and therefore disfavored, the magistrate judge's application of the "heavily and compelling" standard was, as it turns out, erroneous. It is clear *SCFC ILC, Inc.* concluded that a movant seeking a disfavored injunction must "satisfy an even heavier burden of showing that the four [preliminary injunction] factors . . . weigh heavily and compellingly in movant's favor before such an injunction may be issued." 936 F.2d at 1098-99. Subsequent to issuance of the magistrate judge's order, however, a majority of our court sitting *en banc* voted to affirm the core holding of *SCFC ILC, Inc.*, but with one significant alteration. We "jettison[ed] that part of *SCFC ILC* which describes the showing the movant must make [when the movant requests a disfavored injunction] as 'heavily and compellingly.'" *O Centro*, 389 F.3d at 975. Instead, the *en banc* court held that

> courts in this Circuit must recognize that any preliminary injunction fitting within one of the disfavored categories *must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course*. Furthermore, because a historically disfavored preliminary injunction operates outside of the normal parameters for interim relief, movants seeking such an injunction are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard. Instead, a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms, and may not rely on our modified likelihood-of-success-on-the-merits standard.

*Id*. at 975-96 (emphasis added).

Simply stated, the requirement that a movant requesting a disfavored injunction must make a showing that the traditional four factors weigh heavily and compellingly in his favor is no longer the law of the circuit. Accordingly, the magistrate judge erred, albeit unknowingly, in relying on that standard. *See id*. at 982 n.5 ("The failure of the district court to apply the correct standard in evaluating [a disfavored] request for preliminary injunction amounts to an abuse of discretion."). The closer question is whether the court's application of the inappropriate standard warrants a remand. In order to make that determination, we must evaluate the requested injunction on the merits. *See id*. (noting that while the failure of the district court to apply the correct standard "amounts to an abuse of discretion," "because the record on appeal is sufficiently well developed, it is appropriate for the court to determine in the first instance whether [the plaintiff] has met the requisite burden"). If Dr. Schrier, regardless of the standard employed, failed to establish the required preliminary injunction factors, then the magistrate judge's erroneous application of the "heavily and compelling" standard is of no legal consequence.

## III

### *First Amendment Claims*

As noted previously, Dr. Schrier contends defendants violated his First Amendment right of free speech and his rights to academic freedom by terminating his chairmanship in retaliation for public statements he made concerning the Heath Sciences Center's move to Fitzsimons. The magistrate judge held that Dr. Schrier's First Amendment claims failed to establish either a substantial likelihood of success on the merits or irreparable injury sufficient to satisfy the preliminary injunction test. *See Kikumura*, 242 F.3d at 955 (listing four elements of the preliminary injunction test).[2] We agree.

### *Substantial Likelihood of Success on the Merits*

A public employer is liable for retaliatory discharge when it terminates an employee because he engaged in protected speech. *Lybrook v. Members of Farmington Mun. Schools Bd. of Educ.*, 232 F.3d 1334, 1338 (10th Cir. 2000). To determine "whether a public employer's actions impermissibly infringe on free speech rights, we apply the four-prong test articulated in *Pickering v. Bd. of*

---

[2]Because the court determined Dr. Schrier failed to establish irreparable injury or substantial likelihood of success on the merits, it deemed it unnecessary to address the preliminary injunction test's remaining prongs. *See Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 n.8 (10th Cir. 2004).

*Educ.*, 391 U.S. 563 (1968)." *Burns v. Bd. of County Comm'rs of Jackson County*, 330 F.3d 1275, 1285 (10th Cir. 2003) (footnote omitted).

> First, we must determine whether the employee's speech involves a matter of public concern. If so, we then balance the employee's interest in commenting upon matters of public concern against the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. Third, if the balance tips in favor of the employee, the employee then must show that the speech was a substantial factor or a motivating factor in the detrimental employment decision. Fourth, if the plaintiff establishes that speech was such a factor, the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech.

*Finn v. New Mexico*, 249 F.3d 1241, 1247 (10th Cir. 2001) (internal citations and quotations omitted); *see also Hulen v. Yates*, 322 F.3d 1229, 1237 (10th Cir. 2003); *Kent v. Martin*, 252 F.3d 1141, 1143 (10th Cir. 2001). Thus, the initial inquiry in a First Amendment retaliatory discharge case is whether the speech at issue can be "fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 146 (1983). If Dr. Schrier's commentary regarding the Fitzsimons move "cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for [his] discharge." *Id.*

The Supreme Court instructs that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147-48. In evaluating the nature of an employee's speech in a retaliatory discharge case, we

-16-

have articulated that

> [w]hen an employee speaks "as an employee upon matters only of personal interest" the speech is not protected. [*Connick*, 461 U.S. at 147.] To judge whether particular speech relates merely to internal workplace issues, courts must conduct a case by case inquiry, looking to the "content, form, and context" of the speech, [*id.* at 147-48], which includes scrutinizing whether the speaker's purpose was to bring an issue to the public's attention or to air a personal grievance, *McEvoy v. Shoemaker*, 882 F.2d 463, 466 (10th Cir. 1989). An employee's speech must not merely relate generally to a subject matter that is of public interest, but must "sufficiently inform the issue as to be helpful to the public in evaluating the conduct of government." *Wilson v. City of Littleton, Colo.*, 732 F.2d 765, 768 (10th Cir. 1984); *see also Koch v. City of Hutchinson*, 847 F.2d 1436, 1445-47 (10th Cir.) (en banc) (reaffirming *Wilson*), *cert. denied*, 488 U.S. 909 (1988). That is, we look beyond the general topic of the speech to evaluate more specifically what was said on the topic.

*Moore v. City of Wynnewood*, 57 F.3d 924, 932 (10th Cir. 1995). "The first two steps are legal questions which the court resolves to determine whether the speech is constitutionally protected. The second two steps concern causation and involve questions of fact." *Dill v. City of Edmond*, 155 F.3d 1193, 1202 (10th Cir. 1998) (citation omitted).

"In evaluating this type of claim, it is essential to identify the speech which resulted in the alleged retaliation." *Hulen*, 322 F.3d at 1237. The magistrate judge's order characterized Dr. Schrier's speech as follows:

> Dr. Schrier's comments included his concerns about the financial feasibility of the move. Dr. Schrier expressed his concern that too much of the financing consisted of bond debt and that the debt could eventually impact patient care. Dr. Schrier's comments also included his concern that the move imposed a separation of the basic sciences from the clinical sciences and that this disruption of integrated programs within the School of

-17-

Medicine would affect patient care, education, and research.

Aplt. App. at 193. "[B]ecause Dr. Schrier's speech concerned the expenditure of public funds and the potential impact a relocation would have on patient care, education, and research," the magistrate judge held that "his speech addressed matters of public concern." *Id.* We agree. Dr. Schrier's speech addressing the use of public funds and regarding the objectives, purposes and mission of the University of Colorado and its medical school fall well within the rubric of "matters of public concern." *See Gardetto v. Mason*, 100 F.3d 803, 813 (10th Cir. 1996) ("The objectives, purposes, and mission of a public university are undoubtedly matters of public concern. Moreover, in general, speech about the use of public funds touches upon a matter of public concern. . . . Similarly, complaints about the proposed closing of a branch of a university or its spending priorities, when these decisions affect the basic functions and missions of the university, also constitute speech on matters of public concern." (internal citations and quotations omitted)). Therefore, Dr. Schrier satisfied the first prong of the *Pickering* analysis.

"Once a court determines that the plaintiff's speech involves a matter of public concern, the *Pickering* balancing test requires a court to weigh 'the interest of a public employee in commenting on such matters [against] the interest of the employer in promoting the efficiency of its services.'" *Id.* at 815 (quoting *Ware*

-18-

*v. Unified Sch. Dist. No. 492*, 881 F.2d 906, 910 (10th Cir. 1989), *modified in part*, 902 F.2d 815 (1990).

> As to the second step, we balance [the plaintiff's] right to speak out about [the matter of public concern] with whether exercise of that right "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."

*Hulen*, 322 F.3d at 1238 (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).

Dr. Schrier submits that the magistrate judge misapplied the second prong of *Pickering* when it determined that the University's interest in suppressing his speech outweighed his right to free expression without requiring the University to produce evidence of actual disruption. Relying on *Hulen* and *Kent*, Dr. Schrier argues that defendants were obligated to demonstrate actual disruption as a result of his speech in order to prevail on the second *Pickering* prong because they delayed executing their decision to terminate him for approximately five months.

The record supports Dr. Schrier's contention that defendants did not terminate him for some five months after deciding to take such action. Dean Krugman made the decision to terminate Dr. Schrier on or about May 10, 2002, aplt. app., vol. IV at 1033; but did not actually do so until October 10, 2002, *id.*, vol. VII at 2067 (Termination Letter). Our case law also supports Dr. Schrier's argument that an employer must proffer some evidence of actual disruption where

-19-

there has been a delay of several months between the employee's protected speech and the challenged action. *See Hulen*, 322 F.3d at 1239; *Kent*, 252 F.3d at 1145-46.

In *Hulen*, the speech at issue was a tenured university professor's vocal "support of [the] administrative revocation of tenure of [a co-worker] and his speech refusing to withdraw his support for such an investigation despite the university's opposition." 322 F.3d at 1237. In order to combat "more than six years of divisiveness and dysfunction," *id*. at 1233, the university decided to transfer the plaintiff from the Accounting Department to a different department. Although the plaintiff's speech on the issue commenced in 1995, *id*., the university did not transfer him from the Accounting Department to a different department until the summer of 1997. *Id*. We rejected the university's contention that its "interest in carrying out its public business outweighs [the plaintiff's] marginally protected speech," *id*. at 1239, and instead held that

> [f]or the balance to be struck in favor of the governmental employer, there must be some evidence of actual disruption. *Finn*, 249 F.3d at 1249. Although a governmental employer may sometimes rely upon predictions of disruption supported by evidence, that does not apply here *because the challenged action came several months after the protected speech. See Kent v. Martin*, 252 F.3d 1141, 1145-46 (10th Cir. 2001) ("*That legal standard is inapplicable when an employer has allowed an employee to continue to work after the protected expression.*").

*Id.* at 1238-39 (emphases added). In the instant matter, defendants concede that *Hulen* and *Kent* stand for the proposition that a showing of actual disruption is

required when the challenged action occurs several months after the protected speech. Aple. Br. at 28. They contend "the record reveals that Dr. Schrier's speech regarding the move did not cease, but rather he spoke out against and did everything he could to undermine the move from the date the possibility of the move was first discussed until he was removed as department chair." *Id.* at 29.

We read the magistrate judge's order as expressly finding actual disruption:

the evidence established that Dr. Schrier's repeated opposition to the move created conflict among faculty members, the Dean, department chairs, and division heads. Some individuals felt they needed to move to Fitzsimons, but were told by Dr. Schrier that they should stay at the 9th Avenue campus. Some individuals felt intimidated by Dr. Schrier's insistence that the Department of Medicine remain at the 9th Avenue campus and were reluctant to openly oppose him.

Aplt. App., vol. I at 195. The record provides evidence to support the determination that Dr. Schrier's protected speech impaired harmony among co-workers, detrimentally impacted close working relationships within the School of Medicine, impaired his performance as department chair, and interfered with the University's ability to implement the move to Fitzsimons. For instance, approximately twelve faculty members including Dr. Chester Ridgway, head of the Division of Endocrinology, raised concerns to Dean Krugman regarding the move and Dr. Schrier's position that they should remain at the Denver campus. Aplt. App., vol. II at 312-14, 317; *id.*, vol. III at 817-19, 822-23; *id.*, vol. IV at 1022-23. Indeed, some of Dr. Schrier's colleagues testified that he was

-21-

unresponsive to their concerns and that his position with respect to moving the clinical and research education activities to Fitzsimons created contention within the medical faculty. *Id.*, vol. III at 785-94, 798-99, 819-24; *id.*, vol. IV at 858-62, 917-18, 965-68; *id.*, vol. VII at 2058. There is also evidence that Dr. Schrier's attempts to maintain a two-campus system conflicted with the needs of the School of Medicine and the policies established by the President and the Regents of the University. *Id.*, vol. II at 527-29, 532-36; *id.*, vol. IV at 926-28, 1084-86. As a result of the situation, neither Chancellor Shore nor Dean Krugman felt Dr. Schrier could be trusted to work as part of a team to facilitate the move to Fitzsimons. *Id.*, vol. III at 732-33; *id.*, vol. IV at 993, 1006, 1017-18, 1082, 1084-86, 1088-89. Under these circumstances, it was reasonable for the University to conclude that Dr. Schrier's speech, including the manner in which he expressed himself to others, was having a negative impact both on his performance and on the University's operations. *See Craven*, 260 F.3d at 1228-29.

Dr. Schrier further maintains that defendants violated his right to academic freedom, a right he contends is afforded "special constitutional significance." Aplt. Br. at 38. The magistrate judge rejected this argument, reasoning that the right to academic freedom is not "a subset of the First Amendment, separate and distinct from the fundamental right of free speech." Aplt. App., vol. I at 196. In fact, the court expressly refused to endorse any "suggestion that speech in an

academic setting concerning the operations of a university enjoys greater constitutional protection than does political speech in the public forum." *Id.*

Courts have conspicuously recognized that academic freedom is a "special concern" of the First Amendment:

> Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom.

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967); *Vanderhurst v. Colo. Mountain Coll. Dist.*, 208 F.3d 908, 913 (10th Cir. 2000) (academic freedom is "a special concern of the First Amendment"); *see also Shelton v. Tucker*, 364 U.S. 479, 487 (1960) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."). We have also noted that a greater degree of conflict is to be expected in a university setting due to the autonomy afforded members of the university community. *Hulen*, 322 F.3d at 1239 (recognizing that "conflict is not unknown in the university setting given the inherent autonomy of tenured professors and the academic freedom they enjoy"). Nonetheless, we agree with the magistrate judge that an independent right to academic freedom does not arise under the First Amendment without reference to the attendant right of free expression. Thus, the right to academic freedom is not cognizable without a protected free speech or

associational right. Dr. Schrier's argument implies that professors possess a special constitutional right of academic freedom not enjoyed by other governmental employees. We decline to construe the First Amendment in a manner that would promote such inequality among similarly situated citizens.

Because there is no basis for us to second-guess the judgment or the findings of the magistrate judge regarding Dr. Schrier's free speech or academic freedom claims, Dr. Schrier has failed to meet his burden of demonstrating a substantial likelihood of success on his First Amendment claims under any standard applicable to preliminary injunctions.

*Irreparable Injury*

The magistrate judge also concluded Dr. Schrier failed to show he suffered irreparable injury as a result of defendants' actions. Relying on *Elrod v. Burns*, 427 U.S. 347, 373 (1976), Dr. Schrier submits that defendants' violation of his free speech and academic freedom rights, standing alone, constitutes irreparable harm. *Id*. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestioningly constitutes irreparable injury."). As explained in the preceding sections, Dr. Schrier has failed to demonstrate the requisite likelihood of success on his free speech and academic freedom claims. As a result, he is not entitled to a presumption of irreparable injury.

Dr. Schrier further claims he suffered irreparable injury though the loss of academic prestige, standing, or reputation. In addressing this contention, the magistrate judge reasoned that

> [t]he testimony and evidence in support [of] this claim . . . is that Dr. Schrier's reputation was damaged, not because he was removed as chairman, but because no specific reason for the removal of his chairmanship was given. As a result, the public was left to assume the worst. . . . The notion of irreparable injury does not embrace this type of harm, however . . . .
>
> Any loss of prestige, standing, or reputation that Dr. Schrier may have suffered prior to filing this action can be remedied through money damages and does not justify a preliminary injunction. Moreover, Dr. Schrier's claim for lost opportunities is speculative; he provided no evidence of actual lost opportunities. Speculation or unsubstantiated fear of what may happen in the future cannot provide the basis for a preliminary injunction.

Aplt. App. at 201-02 (internal citations and quotations omitted). In other words, because the types of injuries alleged by Dr. Schrier occurred in the past or were speculative, and could be remedied through money damages should he ultimately prevail on his claims, a preliminary injunction was unwarranted. *See, e.g., Mountain Med. Equip., Inc. v. Healthdyne, Inc.*, 582 F. Supp. 846, 848 (D. Colo. 1984).

"To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman*, 348 F.3d at 1189 (internal citations omitted). "[M]erely serious or substantial" harm is not irreparable harm. *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (quotation

omitted).  "[T]he party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."  *Heideman*, 348 F.3d at 1189 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)) (brackets, citations, and internal quotation marks omitted).  "It is also well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages."  *Id.*

Given these considerations, we hold that the court did not abuse its discretion in determining that, without the preliminary injunction, Dr. Schrier would not suffer irreparable harm.  The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance.  *Heideman*, 348 F.3d at 1189 (noting that a preliminary injunction will not issue without a showing of "a clear and present need for equitable relief *to prevent irreparable harm*." (emphasis added) (citation omitted)).  Dr. Schrier has presented no evidence that his removal as Chair during the time it will take to litigate this case will have an irreparable effect in the sense of making it difficult or impossible for him to resume his chairmanship or restore the status quo ante in the event he prevails.  *See, e.g., Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258-61 (10th Cir. 2003) (irreparable harm found when there was danger of actual harm to eagles and

destruction of their breeding grounds if developer were allowed to proceed). Moreover, Dr. Schrier made no attempt to apprise this court of any evidence in the record showing actual or significant risk of loss of prestige, academic reputation or professional opportunities that cannot be remedied by money damages.[3] *Id*. at 1258 (noting that "irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages" but "speculative harm does not amount to irreparable injury").

Because Dr. Schrier has articulated no ground to substantiate a finding of irreparable harm, the court's determination that he suffered no such harm as a result of defendants' alleged constitutional violations cannot constitute an abuse of discretion. Given our foregoing analysis, the magistrate judge's erroneous application of the "heavily and compelling" standard was at most harmless. As a

---

[3]There is evidence in the record supporting the magistrate judge's finding that any harm to Dr. Schrier's reputation was the result not of his removal *per se* but of his removal without explanation. *See, e.g.,* Aplt. App., vol. V at 1273 ("Dr. Krugman has not made public an adequate cause for [Dr. Schrier's precipitous termination as Chair]. This implies that Dr. Schrier has done something improper.") (Letter to President Hoffman signed by ten of Dr. Schrier's colleagues). Harm that resulted solely out of Dr. Schrier's removal without explanation is past harm which presumably ceased with the public filing of this lawsuit and defendants' response regarding the cause for the termination. Exercising one's right to speak out on matters of public concern cannot be viewed as an impropriety even if, as a result of the *Pickering* balance, Dr. Schrier's loss of the chairmanship did not result in a violation of his First Amendment rights.

result, we affirm the denial of Dr. Schrier's requested injunction as to his First Amendment claims.

## IV

### *Breach of Contract Claim*

Dr. Schrier also contends the magistrate judge committed clear error in *sua sponte* dismissing his state law claim on the ground that the Eleventh Amendment deprived the court of federal subject matter jurisdiction when defendants voluntarily removed the instant action from state to federal court.  In light of this alleged error, Dr. Schrier requests a remand for further consideration as to whether a preliminary injunction should be entered in connection with his breach of contract claim.

We review *de novo* the decision to dismiss a claim as barred under the Eleventh Amendment.  *Robinson v. Kansas*, 295 F.3d 1183, 1188 (10th Cir. 2002).  "[A]n unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State" under the Eleventh Amendment.  *Edelman v. Jordan*, 415 U.S. 651, 663 (1974).  An arm of the state, such at the University here, may therefore "assert the Eleventh Amendment as a defense in federal court unless it has waived the defense and consented to suit in federal court."  *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226,

1233 (10th Cir. 1999); *see, e.g., Coll. Sav. Bank v. Fla. Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 681 n.3 (1999) (reiterating "the unremarkable proposition that a State waives its sovereign immunity by voluntarily invoking the jurisdiction of the federal courts").

While "the test for determining a waiver of immunity is strict and . . . there must be an unequivocal intent to waive the immunity," *see McLaughlin v. Bd. of Trs. of State Coll. of Colo.*, 215 F.3d 1168, 1170 (10th Cir. 2000) (internal citations and quotations omitted), we have unequivocally held that a state entity waives its Eleventh Amendment immunity by affirmative litigation conduct such as removing a case to federal court, *see id.* (holding that "when the invocation of federal court jurisdiction [is] brought about by defendants' own counsel, the case presents circumstances showing an extraordinarily effective waiver" (internal citation and quotations omitted)); *see also Estes v. Wyo. Dept. of Transp.*, 302 F.3d 1200, 1204-06 (10th Cir. 2002). Indeed, Supreme Court precedent demands such a result. *See Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 624 (2002) (holding that state of Georgia's "action joining the removing of this case [involving state law claims] to federal court waived its Eleventh Amendment immunity"). Because it is well-settled that immunity is waived when a state entity facing suit in its own courts purposefully seeks a federal forum, the magistrate judge's *sua sponte* Eleventh Amendment immunity ruling was

erroneous.

Nevertheless, we need not remand the contract claim for the magistrate judge to determine whether Dr. Schrier is entitled to a preliminary injunction on this issue. This is so because in evaluating the magistrate judge's denial of a preliminary injunction with regard to Dr. Schrier's free speech and academic freedom claims, we concluded that he suffered no irreparable injury. We have noted that the "showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004).

The record establishes that Dr. Schrier claims no injury resulting from defendants' alleged breach of his employment contract that is distinct and severable from the injury he claims resulted from their alleged First Amendment violations. Both asserted wrongs resulted in precisely the same harm: "loss of academic prestige and influence, loss of standing in the local, national, and international academic and medical communities, a loss of his continuous chairmanship, and injury to his professional reputation, including lost opportunities." Aplt. App., vol. I at 18. Because we have expressly held that Dr. Schrier failed to establish irreparable injury with respect to his First Amendment claim, he cannot prevail on his breach of contract claim in the preliminary

injunction stage of this litigation.[4]

**V**

For the aforestated reasons, we **AFFIRM** the magistrate judge's order denying Dr. Schrier's request for a preliminary injunction.

---

[4]Given this determination, we need not reach defendants' argument that the magistrate judge found Dr. Schrier had no contractual right to continuous appointment as Chair when it ruled on the § 1983 due process claim.