**F I L E D**

PUBLISH

**August 10, 2006**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KAREN HOWDEN WEAVER,

        Plaintiff-Appellant,

v.

        No. 04-2110

MARTIN CHAVEZ;
CITY OF ALBUQUERQUE,

        Defendants-Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CIV-03-281-BB/LFG)**

---

Submitted on the briefs:

J. Douglas Foster, Foster•Johnson•McDonald•Lucero•Koinis, LLP, Albuquerque, New Mexico, for Plaintiff-Appellant.

Deborah D. Wells, Kennedy, Moulton & Wells, P.C., for Defendants-Appellees.

---

Before **EBEL**, **McCONNELL**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

Plaintiff Karen Howden Weaver claimed she was discharged from her employment with the Albuquerque City Attorney's Office in violation of her rights guaranteed by the First Amendment. In particular, she alleged retaliatory discharge for her political support of an opponent of the mayor, and for her speech criticizing what she perceived to be patronage hiring in the City Attorney's Office.[1] A federal jury rejected her claims. She now appeals, and we affirm.[2]

## I. Background

Karen Weaver had been employed as an Assistant City Attorney for six and one-half years before her termination in July 2002. She supported Bob Schwartz in the October 2001 mayoral election, an election that was won by Martin Chavez. Shortly after the election, in December 2001, the newly-elected Mayor Chavez asked for a letter of resignation from each of the approximately thirty-five attorneys employed by the City Attorney's Office, and decided to accept three resignations, including Weaver's. Upon learning that she was pregnant, however, Mayor Chavez changed course. Weaver took maternity leave and returned to the City Attorneys Office in mid-April 2002.

[1] Weaver does not pursue on appeal her claims filed under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17.

[2] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Following the 2001 election, Weaver demonstrated a pattern of making complaints alleging that attorneys had been hired for political reasons. For example, she claimed that two attorneys hired in 2002, one of whom became her supervisor, were political hires. She also commented that the promotion of one of the line attorneys in the office was politically motivated. In June 2002, she made similar complaints about a prospective attorney hire, Ben Chavez. She asserted that the mayor had directed the City Attorney, Robert White, to hire Chavez even though he was not the best qualified applicant. She voiced this complaint directly to White, and also sent e-mail messages to attorneys within and outside the City Attorney's Office. In addition, she spoke by telephone with the attorney who was Chavez's supervisor at his previous place of employment, asking questions about Chavez's performance and qualifications. Weaver was not a member of the office's hiring committee nor did the City Attorney authorize her conversations with Chavez's employer.

On June 13, the City Attorney responded to Weaver's criticism of his hiring practices, informing her via e-mail that no one had been selected for political reasons and cautioning her to be more "reflective" in remarks about her current and future colleagues. The next day, at the behest of the City Attorney, Weaver's immediate supervisor told her to stop interfering with the hiring process, or she would be fired. Weaver continued to exchange e-mail messages touching on this subject with a lawyer friend outside the office who had also applied for

employment with the City Attorney's Office but had not been hired. A few days after the June 14 warning, Weaver stormed out of her office, "used the F word, and said, 'They have just hired Ben Chavez, . . . he's a political hack, and he's never tried a case.'" Aplt. App. Vol. II, at 605. After the City Attorney and the supervising deputy attorney reviewed the situation, they decided to discharge Weaver. Her employment was terminated on July 30, 2002.

Weaver sued, alleging that she was discharged in retaliation for exercising her First Amendment right to speak on matters of public concern by supporting a mayoral candidate other than Martin Chavez and by voicing her concerns about hiring improprieties. The City Defendants responded that Weaver's termination was premised on her intemperate remarks about patronage hiring and her interference in the hiring process. They asserted that Weaver's conduct caused sufficient disruption in the City Attorney's Office to justify firing her.

The district court denied summary judgment and Weaver's claims were tried before a jury. At the close of Weaver's case, finding no evidence to support the retaliation claim based on her support of the losing mayoral candidate, the district court entered judgment as a matter of law in the City's and the Mayor's favor. The remaining First Amendment claim was submitted to the jury, which returned a special verdict finding that Weaver's "criticism of what she perceived to be politically motivated hiring practices in the City Legal Department cause[d] disharmony or disruption in the workplace." Aplt. App. Vol. I, at 320.

-4-

The district court entered judgment against Weaver, and later denied her motion for post-judgment relief. The district court concluded that (1) Weaver's statements disrupted the office and made her difficult to supervise, (2) Weaver interfered with the office's hiring processes, (3) her statements were inappropriate in light of the "time, place, and manner" in which they were made, and (4) a balancing of interests tilted in favor of the City Defendants and justified Weaver's termination. Weaver appeals, challenging the judgment as a matter of law on her claim that she was fired for supporting an opponent of the mayor. She also challenges the district court's analysis of her patronage-hiring claim and asserts that the evidence of disruption was inadequate to justify discharging her.

## II. Discussion

### A. Retaliation for Supporting a Different Candidate for Mayor

Weaver first argues that the evidence introduced at trial shows Mayor Chavez decided to discharge her in December 2001, but "deferred" that decision until July 30, 2002. Accordingly, she contends, the campaign and the discharge decision were close in time, thus raising an inference of retaliation that the jury should have decided. We agree with the district court's resolution of this claim.

"[P]rotected conduct closely followed by adverse action may justify an inference of retaliatory motive." *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir. 1996). "On the other hand, evidence such as a long delay between the employee's speech and challenged conduct, or evidence of intervening events,

tend to undermine any inference of retaliatory motive and weaken the causal link." *Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005) (citations omitted). We review de novo the grant of a judgment as a matter of law. *Praseuth v. Rubbermaid, Inc.*, 406 F.3d 1245, 1250 (10th Cir. 2005).

In analyzing this claim, we reject Weaver's characterization of the events as "deferring" the firing from December 2001 to July 30, 2002. The evidence shows that the decision to terminate her employment was made in July 2002 by the City Attorney, not the Mayor. In addition, the intervening events pertaining to disruption within the office rebut any inference that she was fired for her support of a different candidate. Other attorneys in the department—even the City Attorney—supported the mayor's political opponents, but they were not discharged. Finally, despite hearing trial testimony from both Mayor Chavez and Weaver, no direct or circumstantial evidence was developed to support Weaver's claim of a causal connection between her support of a losing candidate and her termination.

Accordingly, like the district court, we find that "there is no legally sufficient evidentiary basis for a reasonable jury to find" in Weaver's favor on this issue. *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 923 (10th Cir. 2004).

## B. Retaliation for Criticism of Hiring Practices

Weaver's second argument is that the district court erred in concluding that her workplace speech sufficiently interfered with the operation of the City Attorney's office to support her termination. We disagree.

### 1. Legal Framework

"It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987). "[P]ublic employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1957 (2006). The State as an employer, however, has interests in regulating the speech of its employees "that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). The challenge is "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

We apply a four-part test to determine whether a public employer's actions unjustifiably infringe on free speech rights. *Schrier v. Univ. of Colo.*, 427 F.3d

1253, 1262 (10th Cir. 2005). Steps one and two bear on the First Amendment interests at stake:

> First, we must determine whether the employee's speech involves a matter of public concern. If so, we then balance the employee's interest in commenting upon matters of public concern against the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Id.* (quoting *Finn v. New Mexico*, 249 F.3d 1241, 1247 (10th Cir. 2001). If the employee prevails in this analysis, we go on to examine the causal connection between the speech and the adverse employment action:

> Third, if the balance tips in favor of the employee, the employee then must show that the speech was a substantial factor or a motivating factor in the detrimental employment decision. Fourth, if the plaintiff establishes that speech was such a factor, the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech.

*Id.* The first two inquiries are questions of law for the court to decide because they "concern whether the expression at issue is subject to the protection of the First Amendment." *Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996). The third and fourth steps are questions to be resolved by the jury because they concern causation. *Id.*

In this case, only step two is at issue. As to step one, the district court held that Weaver's speech touched on matters of public concern, a ruling the City does not challenge on appeal. *See, e.g.*, *Prager v. LaFaver*, 180 F.3d 1185, 1190 (10th Cir. 1999) ("Speech which discloses any evidence of corruption,

impropriety, or other malfeasance on the part of public officials, in terms of content, clearly concerns matters of public import.") (quotation omitted). Moreover, because the City concedes that the reason for Weaver's discharge was both her speech about patronage hiring and her interference with the hiring process, and because the City does not claim it would have fired Weaver even if she had not engaged in that speech, steps three and four are also not at issue. Therefore, Weaver's appeal rests on our disposition with regard to step two.

The step two balancing test is a question for the court. In conducting the required balancing of interests, the court examines the manner, time, and place of the speech, as well as the context in which the dispute arose. *Connick v. Myers*, 461 U.S. 138, 152-53 (1983). Also relevant is the disruption caused by the employee's speech, namely, "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388. The burden is on the employer to establish such disruptive effects. *Dill v. City of Edmond*, 155 F.3d 1193, 1204 n.5 (10th Cir. 1998). "We will defer to a public employer's reasonable predictions of disruption, but those [predictions] must be supported by the presentation of specific evidence. The employer cannot satisfy its burden by making purely speculative allegations." *Jantzen v. Hawkins*, 188 F.3d 1247, 1257

(10th Cir. 1999) (quotation omitted).  A government employer is not required "to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action."  *Connick*, 461 U.S. at 152.

*2.  Role of Trial Court and Jury at the Step Two Balancing of Interests*

A preliminary question in this case involves the relative role of the trial court and the jury in determining the balancing of interests required at step two. The trial court specifically asked the jury to make a finding whether Weaver's conduct was actually disruptive to the City Attorney's Office.  The jury concluded she was.[3]  Although the court directed the jury through a special verdict form to make this finding, the court itself ultimately conducted the required balancing in ruling for the City at the close of the evidence.  The City argues that the jury's finding should be reviewed only for clear error.  Weaver, on the other hand, maintains that the district court erred in submitting any fact question to the jury because the balancing is entirely a question of law for the court.

It is well-settled that the balancing assessment must be performed by the court, not the jury.  *See Gardetto*, 100 F.3d at 811; *see also Connick*, 461 U.S. at

---

[3]    The special verdict form asked:  "Did Plaintiff's criticism of what she perceived to be politically motivated hiring practices in the city Legal Department cause disharmony or disruption in the workplace?"  Aplt. App. Vol. I, at 320. The jury responded, "Yes."  *Id.*

-10-

148 n.7 (noting that "[t]he inquiry into the protected status of speech is one of law, not fact"). The circuits are split, however, as to whether the jury has *any* role in the *Pickering* balancing, especially where the application of the balancing might turn on disputed questions of fact. *See Lytle v. City of Haysville*, 138 F.3d 857, 864 n.1 (10th Cir. 1998) (recognizing the circuit split but not reaching the issue because appellant failed to allege that any underlying factual disputes affected the *Pickering* balancing). *Compare Johnson v. Ganim*, 342 F.3d 105, 114-15 (2d Cir. 2003) (stating "factual disputes pertaining to the potential for disruption and defendants' motivations in suspending and terminating plaintiff" are issues which "would properly be regarded as a question of fact, to be answered by the jury prior to the district court's application of the *Pickering* balancing test") (quotations omitted), *and Belk v. City of Eldon*, 228 F.3d 872, 881 (8th Cir. 2000) ("Although the balancing of interests is a matter of law for the district court, the underlying factual questions should be submitted to the jury, generally through interrogatories or a special verdict form."), *with Joyner v. Lancaster*, 815 F.2d 20, 23 (4th Cir. 1987) (holding "the advisory jury had no role to play" in resolving the question of "constitutional law for the court").

The Supreme Court has not addressed the role of the jury specifically in the *Pickering/Connick* context. It has in other First Amendment contexts, however. In *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 501 (1984), for example, the Court recognized that determinations of historical fact

-11-

may be left to the judge or jury, but the "rule of independent review" assigns to the court the job of evaluating the ultimate constitutional significance of the facts. Although superficially simple, the distinction between "finding facts" and "applying law" can be quite elusive. *See Miller v. Fenton*, 474 U.S. 104, 113 (1985) (noting that the "appropriate methodology for distinguishing questions of fact from questions of law has been, to say the least, elusive"). The former is a matter for the jury or the judge; the latter solely for the court. But despite the "vexing nature" of the distinction, courts are nonetheless required to separate fact from law to undertake their role in assessing the effect on rights of free expression. *Bose,* 466 U.S. at 501. "An issue does not lose its factual character," however, "merely because its resolution is dispositive of the ultimate constitutional question." *Miller*, 474 U.S. at 113.

The assignment of fact questions to a jury is not susceptible to a bright line rule. And even when a question lends itself to jury resolution, the court is often still called on to resolve a "mixed" question of law and fact. "Perhaps much of the difficulty in this area stems from the practical truth that the decision to label an issue a 'question of law,' a 'question of fact,' or a 'mixed question of law and fact' is sometimes as much a matter of allocation as it is of analysis." *Id.* at 115 (citing Henry P. Monaghan, *Constitutional Fact Review*, 85 Colum.L.Rev. 229, 237 (1985)). The district court, however, is generally in the best position to assess whether the inquiry involves an underlying question of historical fact,

which often turns on judgments of credibility of witnesses or evaluation of demeanor. Those facts as determined by the jury can then be employed in the ultimate constitutional inquiry conducted by the court.

Accordingly, in the context of step two balancing, the decision to submit questions of fact to the jury is within the sound discretion of the district court. While the court must ultimately undertake the *Pickering/Connick* analysis itself—(1) the manner, time, and place of the speech, (2) the context of the speech, and the (3) the effect of any disruption caused by the speech—many of these inquiries may be fact-intensive.[4] Where a district court finds that its balancing rests on a question of historical fact that it reasonably believes the jury is capable of resolving, it can submit that issue to the jury, so long as it performs the final assessment of constitutionality.

Applying these principles here, we find no error. The factually-intensive question of disruption lent itself to jury resolution. This is so particularly in the context of this case, where the parties disputed the effect of Weaver's speech on the workplace. The court reasonably concluded it could be informed by the jury's finding on this issue. After receiving the jury's finding, the district court went on

---

[4]   We can imagine, for example, relevant questions underlying the balancing of interests that might appropriately be submitted to a jury: Did an employee actually make a contested statement?; Did the employer actually warn the employee or mete out discipline?; What was the content of the speech? These questions may call for fact finding, either by a court or by a jury.

to make its own independent balancing assessment of workplace efficiency under *Pickering/Connick*.

In sum, there was no impermissible delegation to the jury of the court's role in making a independent determination of the ultimate constitutional question. The district court did not err by submitting questions of disputed fact to the jury through the special verdict form.

3. *Balancing the Interests*

On appeal, we consider de novo whether the district court erred in concluding the City's interests outweighed Weaver's under the facts of this case. *See Johnsen v. Indep. Sch. Dist. No. 3*, 891 F.2d 1485, 1489 (10th Cir. 1989). We agree with the district court's assessment.

We start with a summary of the testimony at trial. In the judgment of Weaver's supervisors, her speech was insubordinate and disruptive for a number of reasons: (1) her remarks about patronage hiring maliciously attempted to discredit job applicants and reflected poorly on future colleagues, (2) her telephone call with Ben Chavez's then-supervisor breached the confidentiality requested by Chavez and conveyed an unprofessional approach by the city attorneys' office to hiring attorneys, (3) she communicated internal hiring matters to outside attorney candidates contrary to office procedure, and (4) her continued criticism of the Ben Chavez hiring defied the warning from her immediate supervisor to stop.

-14-

Even though we defer to an employer's "reasonable predictions of disruption" to support a balancing of interests, even before actual disruption occurs, *Jantzen,* 188 F.3d at 1257, we need not rely on *predictions* in this case. Both the trial court and the jury concluded the evidence supported a determination of *actual* significant workplace disruption as a result of Weaver's conduct.

First, Weaver's disregard of warnings from her supervisors to stop criticizing potential hires, as well as her continual criticism of what she perceived as patronage hiring, impaired discipline by her superiors. *See Rankin*, 483 U.S. at 388. Weaver was asked to stop criticizing her current and future colleagues. She would not. Her supervisors were not required to tolerate open insubordination, nor were they required to wait for the situation to worsen before responding. *See Connick*, 461 U.S. at 152. Weaver had numerous avenues to express her opinions, but one avenue that was not open was to flout a reasonable request by a supervisor that she desist in impairing workplace morale through her comments.

Second, her disregard of her supervisor's requests are especially troubling given her breach of office confidentiality regarding hiring. Weaver was not a part of the office hiring process, yet she directly contacted an employer of a prospective attorney candidate without authorization. She then passed along the employment information she learned to a friend outside the office. Regardless of the merits of her conversations, such a practice undoubtedly interferes with an

-15-

orderly recruiting and hiring process. This is especially true for a well-functioning public law office, where a "wide degree of deference" is appropriate given that a "close working relationship" between lawyers is "essential to fulfilling public responsibilities." *Id.* at 151-52. As the City Attorney testified, he objected to Weaver's "interfering in the selection of attorneys." Aplt. App. Vol. II, at 473. He did not mind employees recommending their friends for positions in the department. *Id.* at 474. "But to subvert a potential colleague is what [he] found offensive." *Id.*

Third, the time, place, and manner of Weaver's speech weighs against her interests. "When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered." *Connick*, 461 U.S. at 153. Weaver exercised her rights to speech at the office, she communicated her criticism to outsiders, and she continued to complain even after her supervisors told her to stop. These circumstances support the district court's conclusion that Weaver's speech disrupted the functioning of the office. As a result, her conduct had a "detrimental impact on close working relationships for which personal loyalty and confidence are necessary." *Rankin*, 483 U.S. at 388.

Fourth, the evidence shows Weaver's conduct "impede[d] the performance of [her] duties or interfere[d] with the regular operation of the enterprise." *Id.*

-16-

Her comments were either designed to or had the effect of undermining the morale of the office, and created undeserved skepticism regarding the abilities of her fellow attorneys. Her comments to a friend outside of the office also could be construed as an attempt to compromise the hiring process, and, in any event, was a serious breach of confidence from an assistant city attorney in whom substantial client confidences are entrusted.

Therefore, under the totality of the evidence, we agree with the district court that the balance of interests weighs in favor of the government employer's "interest in the effective and efficient fulfillment of its responsibilities to the public." *Id.* Consequently, we hold that the City's interests outweigh Weaver's interests, and her speech was not entitled to First Amendment protection for purposes of her retaliatory discharge claim.

### III. Conclusion

Accordingly, for the reasons discussed above, the judgment of the district court is AFFIRMED.