F I L E D
United States Court of Appeals
Tenth Circuit

April 4, 2006

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENST CIRCUIT

JOYCE A. GILCHRIST,

Plaintiff-Appellant,

v.

BILL CITTY, individually and in his
official capacity as Assistant Police
Chief; KEN McDONALD,
individually and in his official
capacity as Major with the Oklahoma
City Police Department; JOHNNY
KUHLMAN, individually and in his
official capacity as Major with the
Oklahoma City Police Department;
RICHARD DAWES, individually and
in his official capacity as Chemist
Supervisor with the Oklahoma City
Police Department; MATTHEW
SCOTT, individually and in his
official capacity as Chemist with the
Oklahoma City Police Department;
CITY OF OKLAHOMA CITY, a
municipal corporation; M. T. BERRY,
individually and in his official
capacity as Chief of Police; ROBERT
A. JONES, individually and in his
official capacity as Deputy Chief of
Police; GAROLD SPENCER,
individually and in his official
capacity as Major with the Oklahoma
City Police Department; BYRON
BOSHELL, individually and in his
official capacity as Captain with the
Oklahoma City Police Department;

No. 04-6402
(Western District of Oklahoma)
(D.C. No. 02-CV-538-R)

LAURA SCHILE, individually and in
her official capacity as Forensic
Chemist with the Oklahoma City
Police Department; JAMES D.
COUCH, individually,

Defendants-Appellees.

---

**ORDER AND JUDGMENT**[*]

---

**KELLY**, **MURPHY**, Circuit Judges, and **ARMIJO**, District Judge[**]

---

## I. INTRODUCTION

Former Oklahoma City Police Department forensic chemist Joyce A.

Gilchrist sued the City of Oklahoma City and certain of its employees[1] under 42

U.S.C. § 1983. She alleged Defendants terminated her employment in retaliation

for engaging in speech protected by the First Amendment, conspired to deprive

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**]The Honorable M. Christina Armijo, United States District Court, District of New Mexico, sitting by designation.

[1]Gilchrist's complaint named ten current or former police department officers and employees as defendants: Chief M.T. Berry, Deputy Chief Robert A. Jones, Assistant Chief Bill Citty, Major Ken McDonald, Major Johnny Kuhlman, Chemist Supervisor Richard Dawes, Chemist Matthew Scott, Major Garold Spencer, Captain Byron Boshell, and Chemist Laura Schile. Additionally, Gilchrist named as a defendant Oklahoma City's City Manager James D. Couch.

her of constitutionally protected rights, defamed her, denied her procedural and substantive due process, and deprived her of a liberty interest in her good name and reputation. The United States District Court for the Western District of Oklahoma granted summary judgment to Defendants. Gilchrist raises a number of arguments on appeal. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and **affirm** the district court's grant of summary judgment.

## II. BACKGROUND

Gilchrist began working in the forensic laboratory of the Oklahoma City Police Department ("OCPD") in 1980. Gilchrist performed forensic tests in OCPD's investigations of violent crimes and testified in court regarding her analyses. Gilchrist's superiors and officials from the Oklahoma County District Attorney's office gave her commendations and letters of appreciation for her work. In 1990, Gilchrist was promoted to forensic chemist supervisor. As supervisor, Gilchrist was responsible for the administration and operation of OCPD's serology laboratory. She was also responsible for establishing a new DNA laboratory for OCPD, a project that began in the early 1990s.

In June of 1998, a female contractor told Gilchrist that OCPD Major Garold Spencer had harassed her. At the time, Spencer was Gilchrist's supervisor. Gilchrist reported the harassment incident to M.T. Berry, then Chief of Police for Oklahoma City, who ordered an investigation. The contractor told an investigator

"nothing happened" with Spencer, and she did not want to pursue the matter. The investigation was closed, and the police department took no disciplinary action against Spencer.

In May of 1999, Captain Byron Boshell took over as Gilchrist's immediate supervisor. Although Gilchrist had received favorable reviews from her superiors in the past, Boshell claimed the serology lab was "in disarray" when he arrived. While Gilchrist indicated the DNA laboratory would be completed by the fall of 1999, Boshell expressed concern about Gilchrist's progress in setting up the lab. In response to Boshell's concerns about the DNA laboratory, the police department hired an outside consultant, Dr. Roger Kahn, to evaluate the project.

Kahn evaluated the DNA laboratory in August of 1999. While Kahn praised some of Gilchrist's efforts, he concluded much more work was required before the laboratory would be operational. Kahn indicated Gilchrist needed to do more work on laboratory manuals. He also stated Gilchrist did not maintain adequate contact with a technical leader and failed to properly document her studies. He told OCPD officials that, unless something changed, Gilchrist's efforts to implement the DNA project would fail. Kahn recommended the department hire an experienced DNA analyst. In response to Kahn's evaluation, Gilchrist was placed on special assignment and instructed to devote all of her time to completion of the DNA laboratory.

Shortly after Gilchrist was placed on special assignment, the District Court for the Western District of Oklahoma published *Mitchell v. Ward*, 150 F. Supp. 2d 1194 (W.D. Okla. 1999), *aff'd in part and rev'd in part sub nom. Mitchell v. Gibson*, 262 F.3d 1036 (10th Cir. 2001). The *Mitchell* opinion criticized Gilchrist's testimony in the 1992 rape and murder trial of Alfred Brian Mitchell. *See e.g. id*. at 1226–27; 1229. It characterized some portions of Gilchrist's testimony as "without question, untrue" and concluded some of her courtroom statements were, "at least, misleading." *Id*. at 1226, 1227 n.48. The opinion also noted the Oklahoma Court of Criminal Appeals frequently criticized Gilchrist's testimony, scientific reports, and forensic work. *Id*. at 1229 n.52 (citing four cases in which Gilchrist was chastised by the court).

In light of the court's condemnation of Gilchrist in *Mitchell*, OCPD Chief M.T. Berry ordered Boshell to conduct an investigation of Gilchrist's case work and courtroom testimony. A short time later, the department hired Laura Schile, an experienced DNA analyst. In January of 2000, Boshell placed Schile in charge of the DNA project. Boshell instructed Gilchrist to continue working in the DNA laboratory, but as Schile's subordinate.

The working relationship between Gilchrist and Schile deteriorated. In March, Boshell gave Schile complete control of the DNA project and removed Gilchrist to a purely administrative position. On April 3, 2000, Gilchrist filed an

internal grievance against Boshell and OCPD Deputy Chief Robert Jones, complaining that Boshell had unfairly removed her from the DNA laboratory project. Police Chief Berry denied Gilchrist's grievance on May 2, 2000.

Later in 2000, problems came to light regarding evidence handling, packaging, and storage in the serology laboratory. Boshell discovered evidence was missing in at least four cases. The laboratory was also missing serology case files for the years 1980, 1981, and 1990. In July of 2000, Boshell found a box containing exposed and unsealed evidence for a death-penalty case that was being reviewed by the Attorney General's Office. Other evidence boxes had been wet, or were rotting, inappropriately sealed, or inappropriately marked. In October of 2000, a serology laboratory freezer malfunctioned and evidence was contaminated. The contamination was exacerbated because evidence was not stored and packaged properly. On October 13, 2000, the serology laboratory was closed to allow analysts to begin correcting evidence storage and packaging problems.

On January 16, 2001, Boshell submitted to his supervisors a report documenting his investigation of Gilchrist's work in the serology and DNA laboratories. Boshell's report detailed the evidence handling and storage problems which arose during Gilchrist's supervision of the serology laboratory,

and described a variety of other concerns with Gilchrist's management practices.[2]

It concluded Gilchrist wasted tens of thousands of dollars on excessive,

premature, or inappropriate equipment purchases for the DNA laboratory.[3]

Importantly, Boshell's report also alleged Gilchrist performed inaccurate forensic

analyses, interpreted evidence incorrectly, and offered misleading testimony in

criminal cases.

The Boshell report indicated Gilchrist erred in her analysis of hair samples

in the murder case of Robert Miller. It stated Gilchrist had incorrectly determined

the hair samples were consistent with Miller and had wrongly ruled out another

suspect as a possible hair donor. The report noted Gilchrist's work on hair

samples was being challenged in another case as well. Boshell's report cited

instances when Gilchrist failed to disclose evidence and may have deliberately

---

[2]Boshell's report noted the laboratory had no operating, procedure, or safety manuals. The report indicated laboratory chemists were improperly disposing of blood by pouring it down the sink into the city's drainage system. It concluded formal peer review of laboratory casework should have been common, but was not conducted. Boshell also discovered laboratory chemists were not conducting required proficiency tests.

[3]The Boshell report alleged Gilchrist purchased equipment to support a type of DNA analysis the laboratory was never designed to use, and purchased other equipment that was unnecessary or inappropriate for the DNA lab. In March of 2000, chemist Schile determined the laboratory contained approximately $50,000 worth of unuseable equipment. The Boshell report also noted Gilchrist purchased fifty-four pipetters for the DNA laboratory and alleged such a quantity was vastly in excess of the lab's needs. It further contended Gilchrist allowed an instrument maintenance contract to expire and allowed various equipment certifications to lapse.

hidden test results. It found Gilchrist's forensic work had been questioned in an assortment of publications, and determined the Association of Crime Scene Reconstruction had expelled Gilchrist for ethical violations. In addition to the judicial opinions critical of Gilchrist's work cited in the *Mitchell* opinion, Boshell reported another case was overturned in part because of Gilchrist's improper testimony.

After Boshell submitted his report, more problems with Gilchrist's forensic work were exposed. On February 2, 2001, members of the DNA Project of the Oklahoma Indigent Defense System requested that chemist Schile examine evidence in the 1986 rape case of Jeffery Todd Pierce to determine whether it would be suitable for DNA testing. Schile complied, and examined certain slides about which Gilchrist had testified in the Pierce trial. At Pierce's trial, Gilchrist asserted the slides contained sperm and semen. When Schile reexamined the slides, however, she could find sperm on only one of the slides. At Schile's request, three other OCPD forensic analysts reviewed the slides. Like Schile, they found evidence of sperm on only one of the slides. The OCPD submitted six of the Pierce slides to the Oklahoma State Bureau of Investigation ("OSBI"). OSBI reviewed the evidence and determined sperm was not present on any of the submitted slides.

After looking at Gilchrist's analysis of the Pierce evidence, Schile reviewed other cases upon which Gilchrist had worked. In a memorandum to Boshell, Schile reported problems with Gilchrist's packaging and storage of evidence and noted Gilchrist's documentation was "questionable." Schile recommended a more thorough investigation of the Pierce case and a review of other cases. Police Chief Berry requested the assistance of the Federal Bureau of Investigation ("FBI").

Special Agent Douglas Deedrick of the FBI reviewed eight of Gilchrist's cases and was critical of the quality of her forensic analyses. Deedrick noted Gilchrist's laboratory notes frequently were incomplete or inadequate and asserted Gilchrist erred in identifying or interpreting samples in each of the five cases where she had used glass microscope slides to make hair or fiber comparisons. Deedrick recommended a review of all instances when Gilchrist had connected hair or fiber samples with a suspect or victim, when such evidence was significant to the outcome of the trial. Deedrick's report also criticized the credibility of Gilchrist's testimony in criminal cases, stating that, in several instances, Gilchrist "made statements that went beyond the acceptable limits of forensic science."

Scientists from the Serological Research Institute ("SERI") reviewed Gilchrist's work in the Jeffery Todd Pierce case. In 1989, Gilchrist's serological analysis and courtroom testimony had helped prosecutors convict Pierce of rape,

sodomy, burglary, and assault with a dangerous weapon. More than a dozen years later, the SERI scientists used DNA analysis[4] to conclude the donor of the sperm cells found on the rape victim's clothing was not Pierce. As a result of SERI's review, Pierce was found factually innocent of committing the crimes for which he was charged and convicted. Pierce was freed from incarceration and his sentence and conviction were vacated.

The SERI report was issued on May 7, 2001. That same day, Oklahoma City officials placed Gilchrist on leave and gave her written notice of a pretermination hearing. The notice advised Gilchrist that she was alleged to have mismanaged the serology and DNA laboratories, that her credibility was challenged in courts and in forensic journals, and that her casework analysis was flawed. Gilchrist also received a memorandum which outlined the results of Boshell's investigation, a copy of the FBI's review of her casework, and a report of Boshell's inquiry into the complaint Gilchrist had lodged against Major Spencer in 1998.

On July 13, 2001, SERI submitted to Boshell an audit of the OCPD forensic laboratory. SERI scientists reviewed Gilchrist's work and testimony in the Jeffery Todd Pierce and Curtis McCarty cases. After reviewing the evidence and

---

[4]Gilchrist asserts she did not perform DNA testing at the time she conducted her serological analysis of the evidence in the Pierce case because DNA technology did not exist at that time.

Gilchrist's testimony in the Pierce case, the SERI scientists concluded Gilchrist gave erroneous testimony and "show[ed] a total disregard for the results of her analysis and a prejudice against the defendant." In the McCarty case, the SERI scientists determined Gilchrist's courtroom statements "display[ed] a terrible prejudice to the defendant," and portions of her testimony were "hopelessly confusing and self-contradicting."

Gilchrist's pretermination hearing began on August 21, 2001, and lasted eight days. The hearing was conducted before a departmental review board consisting of Bill Citty, Richard Dawes, Matthew Scott, Ken McDonald, and Johnny Kuhlman. When Gilchrist was notified of the proposed board, she submitted a written response indicating she did not object to the composition of the board. After the hearing concluded, the review board sustained allegations that Gilchrist made inappropriate expenditures when she supervised the forensic laboratory, was dishonest in communicating with her supervisors, mishandled evidence and case files, and failed to establish and follow proper procedures. The board further sustained allegations that Gilchrist's courtroom testimony resulted in criticism which compromised OCPD's integrity and that her casework analysis was flawed and improperly documented. The board recommended termination of Gilchrist's employment. Police Chief Berry terminated Gilchrist on September 25, 2001.

In October 2001, Gilchrist's attorney filed an internal grievance with the police department challenging her termination. The grievance review board conducted a hearing, at which Gilchrist was represented by counsel. At the conclusion of the hearing proceedings, the grievance board recommended to the City Manager, James Couch, that Gilchrist's grievance be denied. Couch upheld Gilchrist's termination.

In April 2002, Gilchrist filed a complaint in district court, asserting seven causes of action. She alleged the City, police department personnel, members of the pretermination hearing board, and other officials (1) violated her First Amendment rights by retaliating against her for reporting the alleged incident of sexual harassment involving Major Spencer in 1998; (2) violated her First Amendment rights by retaliating against her for testimony she gave in criminal cases; (3) conspired to violate her rights; (4) defamed her; (5) deprived her of substantive due process; (6) deprived her of procedural due process; and (7) deprived her of her liberty interest in her good name and reputation. The district court granted motions for summary judgment in favor of Defendants.[5] Gilchrist appeals the district court's decisions.

_____

[5]The district court granted the motions for summary judgment of defendants Berry, Couch, Citty, McDonald, Kuhlman, Dawes, Scott, and the City of Oklahoma City in an order dated June 7, 2004. The district court granted the motions for summary judgment of defendants Jones (now deceased), Spencer, Boshell, and Schile in an order dated December 3, 2004.

-12-

### III.   ANALYSIS

### A.   Standard of Review

This court reviews *de novo* a district court's grant of summary judgment. *Salehpoor v. Shahinpoor*, 358 F.3d 782, 785 (10th Cir. 2004).  Summary judgment is appropriate when no genuine issue of material fact is in dispute and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of material fact exists, we must construe the facts and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.  *Curtis v. Okla. City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1214 (10th Cir. 1998).

"[T]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a genuine issue of material fact." *Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1068 (10th Cir. 2005) (quotations omitted).  "Thus, for a genuine issue of material fact to exist, the nonmovant must present facts upon which a reasonable jury could find in favor of the nonmovant." *Id*.  Unsupported conclusory allegations do not create an issue of fact.  *See Matthiesen v. Banc One Mortgage Corp.*, 173 F.3d 1242, 1247 (10th Cir. 1999).

In summary judgment cases raising First Amendment issues, an appellate court must independently examine the whole record to ensure "the judgment does not constitute a forbidden intrusion on the field of free expression." *Melton v.*

*City of Okla. City*, 879 F.2d 706, 713 (10th Cir. 1989) (quotations omitted).  The court must focus its examination on the record; facial assertions in a complaint are insufficient to overcome summary judgment when the record as a whole reveals no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Salehpoor*, 358 F.3d at 786.

**B.      Retaliation for Reporting Sexual Harassment**

Gilchrist's complaint contends certain of the defendants violated her First Amendment rights by terminating her employment in retaliation for her 1998 report of an alleged incident of sexual harassment involving Major Spencer and a third party.  The district court granted summary judgment to the defendants.  Gilchrist argues the court erred when, at the summary judgment stage, it determined she did not present evidence sufficient to support her retaliation claim.  Gilchrist asserts that when the district court reviewed the sufficiency of the evidence, it improperly determined a question of fact that should have been reserved for the jury.

"A public employer is liable for retaliatory discharge when it terminates an employee because [she] engaged in protected speech."  *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1262 (10th Cir. 2005).  This court uses a four-prong test to determine whether a government employer's actions impermissibly infringe upon the free speech rights of its employee.  *Id*.

> First, we must determine whether the employee's speech involves a matter of public concern. If so, we then balance the employee's interest in commenting upon matters of public concern against the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. Third, if the balance tips in favor of the employee, the employee then must show that the speech was a substantial factor or a motivating factor in the detrimental employment decision. Fourth, if the plaintiff establishes that speech was such a factor, the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech.

*Id.* "The first two factors present questions of law. The latter two factors address causation and present questions of fact subject to the preponderance of the evidence standard." *Maestas v. Segura*, 416 F.3d 1182, 1187–88 (10th Cir. 2005)

Assuming Gilchrist has presented evidence sufficient to demonstrate her 1998 report of sexual harassment satisfies the first two prongs of the test, we must decide whether she has also shown that the incident was a substantial or motivating factor in her termination. "Under the third factor [of the four-part test], the employee has the initial burden of establishing causation—that is, to show the exercise of constitutionally protected speech was a substantial motivating factor in the employer's decision to adversely alter the employee's conditions of employment." *Id.* at 1188. "To withstand summary judgment at step three, therefore, an employee must produce evidence linking the employer's action to the employee's speech." *Id.*; *see also Butler v. City of Prairie Village, Kan.*, 172 F.3d 736, 746–47 (10th Cir. 1999) (affirming district court's grant of

-15-

summary judgment to defendants when plaintiff offered only "doubtful and inconclusive evidence" to support his retaliation claim).

Contrary to Gilchrist's assertion, the district court in this case did not improperly decide an issue of fact. Instead, it properly conducted a review of the evidence to determine whether there was *any* support for Gilchrist's retaliation claim. After conducting its review, the district court concluded Gilchrist failed to offer any evidence to suggest her termination was undertaken in retaliation for her 1998 sexual harassment complaint.

After examining the record in this case, we agree with the district court's conclusion. As the district court correctly notes, more than three years lapsed between Gilchrist's 1998 sexual harassment complaint and her 2001 termination. Such a significant temporal gap does not warrant an inference of retaliatory motive. *See Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (upholding district court's decision that gap of three *months* between protected activity and termination, standing alone, does not warrant inference of retaliatory motive). Gilchrist fails to point out anything else in the record that might tie her report of sexual harassment to her employer's decision to terminate her. Because Gilchrist failed to establish any connection between her termination and her sexual harassment complaint, the district court properly granted summary judgment to Defendants.

**C.     Retaliation for Courtroom Testimony**

Gilchrist's complaint also alleges Defendants violated her First Amendment rights by terminating her employment in retaliation for the expert witness testimony she gave in the James Ables, Harold Weatherly, Elmer Lee Miller, Jeffrey Todd Pierce, Mark Fowler and Bill Fox, Curtis McCarty, and Alfred Brian Mitchell criminal cases.  Again, the district court granted summary judgment to Defendants.  On appeal, Gilchrist contends the district court erred when it determined she failed to prove her courtroom testimony was truthful and thus entitled to protection under the First Amendment.  She also asserts the district court erred when it concluded she did not prove her interest in providing expert testimony in the seven criminal cases outweighed the government's interest in the efficient administration of its criminal justice system.  Again, we analyze Gilchrist's claims under the four-prong test described above in Part III.B. Initially, this court must determine whether Gilchrist's speech concerns a matter of public concern.  *See Schrier*, 427 F.3d at 1262.  If it does, this court must conduct a *Pickering* balancing test, in which we weigh Gilchrist's interest in speaking against OCPD's interest in restricting her speech.  *Id*.; *see Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968).

   *(1)     Matter of Public Concern*

In ascertaining whether a public employer has impermissibly infringed upon

its employee's First Amendment rights, the threshold question "is whether the

speech at issue can be fairly characterized as constituting speech on a matter of

public concern." *Schrier*, 427 F.3d at 1262 (quotations omitted). In deciding

whether speech involved a matter of public concern, courts consider whether the

speaker intended to redress a personal grievance or was motivated by a broader

public purpose. *Hulen v. Yates*, 322 F.3d 1229, 1237 (10th Cir. 2003). The

content, form, and context of an employee's speech, as revealed by the whole

record, are also relevant to the inquiry. *Id.*

"The goal of our criminal justice system [is] to arrive at the truth, and the

interests of the parties in the case are furthered by witnesses who provide

testimony to assist the trier of fact." *Worrell v. Henry*, 219 F.3d 1197, 1209 (10th

Cir. 2000) (quotations and citation omitted). Generally, a forensic scientist's

expert testimony in a criminal case will assist the trier of fact in arriving at the

truth, and will therefore involve a matter of public concern. In this case,

however, the record contains substantial evidence indicating Gilchrist's testimony

in the seven criminal cases at issue was false, prejudicial, or misleading.[6] "It is

[6]This evidence is summarized in the departmental review board's report recommending Gilchrist's termination, dated September 21, 2001. Among other criticisms, the report alleges appellate courts found Gilchrist's testimony to be "improper" and "at least, misleading." The board report also contends experts found Gilchrist offered testimony that "show[ed] a total disregard for the results

difficult to see how a maliciously or recklessly false statement could be viewed as addressing a matter of public concern." *Wulf v. City of Wichita*, 883 F.2d 842, 859 n.24 (10th Cir. 1989).

Gilchrist, however, insists the record does not show that her trial testimony was maliciously or recklessly false. Instead, she argues the evidence supports only the claim that her testimony was unclear or unintentionally misleading. For example, while she concedes the district court in *Mitchell* determined some of her testimony was untrue, Gilchrist denies knowingly lying on the witness stand. Instead, Gilchrist argues she was not properly questioned at trial and therefore omitted information that would have explained her questionable testimony.

Whenever possible, we must construe the record in Gilchrist's favor. *See Curtis*, 147 F.3d at 1214 (noting courts must construe record favor of nonmoving party when reviewing grants of summary judgment). Based on the evidence presented, it is possible a jury could determine Gilchrist's courtroom testimony was not maliciously or recklessly false. Accordingly, we must conclude her testimony in the seven criminal cases involved a matter of public concern and thus satisfies the first prong of the four-part test.

*(2)* Pickering *Balancing*

---

of her analysis and a prejudice against the defendant" and was "beyond her expertise."

Having concluded Gilchrist's courtroom testimony involved a matter of public concern, this court must conduct a *Pickering* balancing analysis. Under the *Pickering* test, "[e]mployee speech is protected only if the employee's interest in free expression outweighs the employer's interest in restricting the speech." *Worrell*, 219 F.3d at 1206. As explained below, we conclude the balancing test in this case unquestionably favors Defendants.

First, we consider Gilchrist's interest in testifying in the seven criminal trials. In evaluating a public employee's interest in speaking, this court considers "the manner, time, and place" of her speech, as well as the context of the dispute. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Importantly, "[t]he burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." *Id*. at 390. Here, Gilchrist spoke as an expert witness in a criminal proceeding where defendants' lives and liberty interests were at stake. She thus bore a heavy burden of caution. Gilchrist's trial testimony, however, was not cautious. Even when viewed in a light most favorable to her, the record establishes Gilchrist's expert witness testimony was unclear, misleading, and marred by significant omissions. *See* Part III.C(1). We give scant weight to Gilchrist's interest in providing this kind of testimony in the seven criminal cases at issue. *See Johnsen v. Indep. Sch. Dist. No. 3*, 891 F.2d 1485, 1493 (10th Cir. 1989) (concluding

plaintiff's careless and possibly reckless statement weighed against her in *Pickering* balancing test).

Next, we evaluate the OCPD's interest in restricting Gilchrist's speech. "In weighing the government employer's interest, the primary consideration is the impact of the disputed speech on the effective functioning of the public employer's enterprise." *Lytle v. City of Haysville, Kan.*, 138 F.3d 857, 868 (10th Cir. 1998) (quotations omitted). "For the balance to be struck in favor of the governmental employer, there must be some evidence of actual disruption." *Hulen*, 322 F.3d at 1238–39. "Another relevant consideration is whether the employee's speech calls into question the employee's competence to perform his or her job." *Curtis*, 147 F.3d at 1213.

In this instance, Gilchrist's testimony prompted harsh criticism from courts of law, resulted in the conviction of a defendant who was later determined to be factually innocent of the crime charged, and required the retrial of another defendant. Her reputation in the criminal justice community was so damaged that her superiors hired a new DNA specialist and restricted Gilchrist's role in implementing OCPD's DNA laboratory to avoid "credibility and integrity issues in the courts." The record undeniably supports Defendants' assertions that Gilchrist's courtroom testimony resulted in actual disruption to OCPD's forensic

laboratory.[7] Moreover, it demonstrates Gilchrist's expert witness testimony reflected negatively on her competence. Accordingly, OCPD's interest in restricting Gilchrist's speech was significant.

In balancing the interests of the parties, we conclude OCPD's interest in restricting Gilchrist's courtroom speech outweighed Gilchrist's interest in making such speech. Because Gilchrist cannot satisfy the second prong of the four-part test, she cannot show OCPD's actions impermissibly infringed on her right to free speech under the First Amendment. The district court therefore correctly granted summary judgment to Defendants.

## D.    Liberty Interest

Gilchrist alleges Defendants deprived her of her liberty interest in her good name, reputation, honor, and integrity. The district court granted summary judgment to defendants. Gilchrist appeals the district court's order, arguing the court erred when it determined Gilchrist's claim was not supported by the evidence.

---

[7]Gilchrist argues, without citation to authority, that these examples of disruption are irrelevant because they occurred years after her testimony in the seven criminal cases. Her contention has no merit. For purposes of our analysis, it makes no difference that the repercussions of Gilchrist's courtroom testimony were not felt immediately. The record makes clear Gilchrist's courtroom testimony caused actual disruptions in the functioning of OCPD's forensic laboratory, even if those disruptions took years to manifest.

Statements infringe upon an employee's liberty interest in her good name and reputation when they (1) impugn the employee's good name, reputation, honor, or integrity; (2) are false; (3) occur in the course of terminating the employee or foreclose other employment opportunities; and (4) are published. *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994). All four elements must be satisfied to demonstrate deprivation of the liberty interest. *Id*.

Gilchrist contends certain statements made in Boshell's January 16, 2001 memorandum and in FBI Agent Deedrick's report impugn her good name and reputation. She alleges Boshell's memorandum accuses her of mismanagement and carelessness in the laboratory, and alleges the FBI report accuses her of incompetent forensic analysis and improper courtroom testimony. As explained below, however, Gilchrist does not identify any false statement, in either the Boshell memorandum or the FBI report, concerning her laboratory management or forensic work.

In an attempt to demonstrate the Boshell report contained false statements, Gilchrist cites to documents pertaining to consultant Roger Kahn's evaluation of her efforts to implement the DNA laboratory. Gilchrist notes the documents she cites show Kahn's evaluation applauded some of her work. The Boshell report, however, did not imply otherwise; it candidly acknowledged Khan's praise of

some of Gilchrist's efforts. The documents Gilchrist cites simply do not establish the Boshell report contained false statements.[8]

Gilchrist also notes Agent Deedrick admitted his report contained an inaccuracy, and alleges the inaccuracy amounts to a false statement. At Gilchrist's pretermination hearing, Agent Deedrick admitted his report made it seem as though certain of Gilchrist's statements at the trial of David J. Bryson were consecutive when in fact they were taken from different sections of the trial transcript. After comparing the original trial transcript with the FBI report, it is readily evident the FBI report did not alter the import of Gilchrist's testimony. Gilchrist failed to demonstrate the FBI report contained false statements.

The record does not support Gilchrist's assertions that the Boshell report and the FBI report contain false statements which impugn her reputation. Gilchrist thus cannot demonstrate Defendants deprived her of her liberty interest in her good name, reputation, honor, or integrity. The district court properly granted summary judgment on this issue to Defendants.

---

[8]Gilchrist also attempts to demonstrate the Boshell report contained false statements by citing to documents which show her laboratory expenditures were approved by her superiors. In discussing the first of Gilchrist's questionable equipment purchases for the DNA laboratory, the Boshell report acknowledges the expenditure was approved by Gilchrist's superior. While the report does not indicate the rest of Gilchrist's equipment purchases were approved by her superiors, neither does it indicate Gilchrist made the purchases without authorization. The Boshell report's lack of specificity on this topic does not amount to a false statement.

**E.     Other Claims**

*(1)     Composition of Departmental Review Board*

Defendants sought summary judgment on any claim Gilchrist may have asserted with respect to the composition of the departmental review board that conducted Gilchrist's pretermination hearing. The district court observed Gilchrist's attorney had explicitly consented to the composition of the review board in a letter dated May 18, 2001, and granted Defendants' motion. On appeal, Gilchrist apparently misconstrues the district court's order. She argues her failure to object to the composition of the departmental review board does not operate as a waiver of her constitutional rights. The district court, however, never indicated Gilchrist had waived her constitutional rights. It only ruled Gilchrist had forfeited her right to make legal claims based on the *composition* of the review board. Because Gilchrist's brief does not address the issue ruled upon by the district court—claims relating to the *composition* of the departmental review board—she has waived the argument. *See Ambus v. Granite Bd. of Educ.*, 975 F.2d 1555, 1558 n.1 (10th Cir. 1992), *modified on other grounds on reh'g*, 995 F.2d 992 (10th Cir. 1993).

*(2)     Denial of Discovery*

Gilchrist's complaint alleged Defendants violated her right to procedural due process when they failed to turn over to her the results of OCPD's

-25-

investigation of her 1998 report of sexual harassment involving Major Spencer. The district court observed the evidence indicated Gilchrist had received all documents pertaining to the Spencer investigation except certain notes Defendants had deemed irrelevant. The court concluded Gilchrist had not shown Defendants' failure to provide her with the notes or with other documents had deprived her of due process, and it granted summary judgment to defendants.

"A court of appeals is not required to manufacture an appellant's argument on appeal when it has failed in its burden to draw our attention to the error below. In the event of such a failure, the court will ordinarily consider the appellant's point waived." *Hernandez v. Starbuck*, 69 F.3d 1089, 1093 (10th Cir. 1995) (quotation and citation omitted); *see Perry v. Woodward*, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999) (noting this court "will not craft a party's arguments for him"). Gilchrist's appellate brief contains a heading entitled "Denial of Discovery," followed by a summary of Defendants' reasons for withholding the requested information. It does not, however, contain an argument on the subject. Because Gilchrist failed to present an argument, we consider the issue waived.

*(3)    Qualified Immunity*

Certain of the defendants asserted they were entitled to summary judgment on the basis of qualified immunity. The district court agreed, concluding Gilchrist failed to show Defendants' actions violated clearly established law.

Gilchrist contends the district court erred in granting summary judgment on the issue of qualified immunity.

To defeat a claim of qualified immunity, Gilchrist must first demonstrate a violation of a constitutional right. *See Finn v. New Mexico*, 249 F.3d 1241, 1250 (10th Cir. 2001). She contends defendants violated her clearly established right to testify at a criminal trial without being subjected to termination. As discussed in Part III.C above, Gilchrist has not demonstrated defendants violated her First Amendment right to testify in a court of law. Because Gilchrist has failed to establish a violation of a constitutional right, we find no error in the district court's grant of summary judgment to the defendants.

*(4) Conspiracy*

Gilchrist alleged certain of the defendants conspired to deprive her of constitutional rights. The district court determined Gilchrist failed to demonstrate an actual deprivation of federally protected rights, and granted summary judgment to defendants. Gilchrist contends the district court's decision was error. To recover under a § 1983 conspiracy claim, a plaintiff must prove (1) a conspiracy and (2) an actual deprivation of rights. *Dixon v. City of Lawton, Okla.*, 898 F.2d 1443, 1449 (10th Cir. 1990). Like the district court, this court concludes Gilchrist failed to point to evidence indicating an actual deprivation of rights. *See supra* Parts III B.–D., III E(2). We discern no error in the court below.

## IV. CONCLUSION

For the foregoing reasons, we **affirm** the judgment of the United States District Court for the Western District of Oklahoma.

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge