AMERICAN CIVIL LIBERTIES UN-
ION OF KANSAS AND WESTERN
MISSOURI, Plaintiff,

v.

Sandy PRAEGER, Kansas Insurance
Commissioner, in her official
capacity, Defendant.

Case No. 11–2462–WEB–KGG.

United States District Court,
D. Kansas.

Sept. 29, 2011.

Andrew D. Beck, Brigitte Amiri, Jennifer Dalven, American Civil Liberties Union Foundation, New York, NY, Stephen D. Bonney, ACLU of Kansas and Western Missouri, Kansas City, MO, for Plaintiff.

Jeffrey A. Chanay, Office of Attorney General, Topeka, KS, Todd N. Thompson, Robert W. Ramsdell, Sarah E. Warner, Shon D. Qualseth, Stephen R. McAllister, Thompson Ramsdell & Qualseth, P.A., Lawrence, KS, for Defendant.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

Plaintiff American Civil Liberties Union of Kansas and Western Missouri ("ACLU") filed this action under 42 U.S.C. § 1983 seeking declaratory and injunctive relief to halt enforcement of a Kansas statute which took effect on July 1, 2011. A portion of the statute essentially prohibits insurance companies in Kansas from providing coverage for "elective"[1] abortion services under comprehensive health insurance policies.[2] 2011 Ks. H.B. 2075, § 8(a), amending K.S.A. § 40-2124. The law provides that coverage for such services may be obtained through purchase of a separate optional rider, the premium for which must be calculated so as to fully cover the estimated cost of covering elective abortions per enrollee on an actuarial basis. *Id.* The complaint alleges that this provision and other portions of the statute violate the rights of plaintiff's members under the Due Process and Equal Protection provisions of the Fourteenth Amendment.

Along with the complaint plaintiff filed a motion for preliminary injunction. Doc. 3. The motion seeks to enjoin enforcement of the above-described provision of the statute. Pursuant to 28 U.S.C. § 636(b)(1)(B),

the court previously referred the motion to U.S. Magistrate Judge Kenneth G. Gale for a Report and Recommendation. Judge Gale held a hearing on September 16, 2011, and issued a Report and Recommendation on September 19, 2011. The Report found that the affidavits submitted by plaintiff in support of the motion were lacking in foundation and were inadequate to show irreparable injury. The Report recommended that the court deny the motion for preliminary injunction on that basis. Plaintiff has filed a timely objection to the Report and Recommendation.

### I. Standard of Review.

On a matter referred to a magistrate under 28 U.S.C. § 636(b)(1)(B), the court makes a *de novo* determination of all matters objected to. *See* § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). *De novo* review requires the district court to consider relevant evidence of record and not merely review the magistrate's recommendation. *Griego v. Padilla (In re Griego)*, 64 F.3d 580, 584 (10th Cir.1995). The district court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. It may also receive further evidence or recommit the matter to the magistrate judge with instructions. § 636(b)(1).

### II. Standards for a Preliminary Injunction.

A preliminary injunction is an order, entered before a final determination

---

1. The statute allows a comprehensive policy to cover any procedure that is "necessary to preserve the life of the mother." It prohibits coverage for "elective" abortions, which the statute defines to mean "an abortion for any reason other than to prevent the death of the mother...." 2011 Ks. H.B. 2075, § 8(c)(2).

2. The law applies to any health insurance policy issued, amended or renewed after July 1, 2011.

of the merits, that commands a party to do or refrain from a specified act. The basic purpose of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits can be held. *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1255 (10th Cir. 2003).

 "A preliminary injunction is an extraordinary remedy; it is the exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984). It "constitutes drastic relief to be provided with caution ... [and] should be granted only in cases where the necessity for it is clearly established." *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888–89 (10th Cir.1989). The right to relief on a preliminary injunction "must be clear and unequivocal." *Greater Yellowstone Coal.*, 321 F.3d at 1256.

 Injunctions that disrupt the status quo are particularly disfavored and "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Beltronics, USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir.2009) (*quoting Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir.2005)). When a preliminary injunction would alter the status quo, the movant bears a heightened burden and "must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir.2004) (en banc), *aff'd*, 546 U.S. 418, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006). The *status quo* refers to the last peaceable uncontested status existing between the parties before the dispute developed. *Nova Health Systems v. Edmondson*, 460 F.3d 1295, 1298, n. 5 (10th Cir.2006).

 Defendant contends the injunction sought by plaintiff would disrupt the *status quo*, because the statute now being challenged has been in effect since July 1, 2011, and plaintiff seeks to alter the legal landscape by enjoining further enforcement of the law. Doc. 14 at 5. Although this argument has facial appeal, the court concludes that the last uncontested status between the parties before the dispute arose would be that which existed prior to the challenged statute taking effect. *Cf. Schrier v. University of Colo.*, 427 F.3d 1253 (10th Cir.2005) (last peaceable uncontested status between the parties was prior to plaintiff's ouster as chair of his university department). As noted by the concurrence in *Centro Espirita*, "[w]hen a statute is newly enacted, and its enforcement will restrict rights citizens previously had exercised and enjoyed, it is not uncommon for district courts to enjoin enforcement pending a determination of the merits of the constitutional issue." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir.2004) (en banc) (McConnell, J., concurring), *cert. granted sub nom on other grounds, Gonzales v. O Centro Espirita Beneficiente Uniao Do Vegetal*, 544 U.S. 973, 125 S.Ct. 1846, 161 L.Ed.2d 723 (2005). On the other hand, "[w]hen a statute has long been on the books and en-

forced, ... it is exceedingly unusual for a litigant who challenges its constitutionality to obtain (or even to seek) a preliminary injunction against its continued enforcement." *Id.* As suggested by Judge McConnell, this is consistent with the general rule on *status quo:* "[I]t is sometimes necessary to require a party who has recently disturbed the *status quo* to reverse its actions. Such an injunction restores, rather than disturbs, the *status quo ante,* and is thus not an exception to the rule." *Id.* This is particularly apt under the current circumstances, because the Kansas law has a "rolling effect" that may impact particular health insurance policies not immediately, but later when the policy is renewed, and in fact plaintiff's allegation is that one of its members will lose abortion coverage under a comprehensive policy as of October 1, 2011. Under the circumstances, the court concludes that the heightened standard for injunctions that alter the *status quo* does not apply to plaintiff's request for preliminary injunction.

### III. *Summary of Objections.*

Magistrate Judge Gale's Report addressed irreparable harm, which is an essential element for obtaining a preliminary injunction. He examined the sworn declaration of plaintiff's Program Director, Ms. Weatherford, which stated in part that some ACLU members have lost their insurance coverage for abortion and some will lose such coverage in the future, including a member who will lose her current coverage on October 1, 2011, and that for some members "paying for an abortion would impose financial difficulties." Judge Gale said he was unable to ascertain how the Program Director collected the information presented or how she arrived at the general conclusions set forth, because there was an absence of foundation for her statements. He further said "[a]n expla-

nation of how the Act, which requires the issuance of separate riders for abortion coverage, will likely result in the loss of insurance to Plaintiff's members who may require the procedure—with foundation for those claims—is lacking." He found the cost of abortion care relative to the financial ability of the woman "is relevant—perhaps critical—to the irreparable harm inquiry," but the Program Director's general statement that the Act will impose "financial difficulties" on some members was too vague and unsupported for the court to conclude there was irreparable harm. Judge Gale also denied plaintiff's request to supplement or add to the submitted declarations, noting that the motion was filed a month before the hearing and plaintiff had not claimed an inability to provide evidentiary support for its motion in a timely fashion. In sum, he found, "[b]ecause Plaintiff has failed to present evidence sufficient to establish its 'clear and unequivocal right to relief,' the motion must fail." Doc. 17 at 11.

Plaintiff contends the Magistrate's conclusion is inconsistent with the well-established principle that violation of an individual's constitutional rights, even temporarily, constitutes irreparable harm as a matter of law. Plaintiff contends the ban on comprehensive coverage for abortion services violates its members' rights and thus causes irreparable harm as a matter of law. Doc. 18 at 5 (*citing, inter alia, Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir.2011) (district court mistakenly assumed violation of constitutional rights was not irreparable harm)). As such, plaintiff argues, the Magistrate's comment that the cost of care was critical to a showing of irreparable harm is contrary to settled law.

Plaintiff also objects to the Magistrate's finding of a lack of foundation for Ms. Weatherford's declaration. It argues the

declaration was based on her personal knowledge and was otherwise simply a combination of common sense and the undisputed facts reflected in the parties' factual stipulation. Moreover, plaintiff argues it should be allowed to cure any evidentiary defect, and asks that it be allowed to submit an additional declaration from one of its members. It argues the court should reject the Magistrate's recommendation, that it should be allowed to cure the evidentiary defect, and that the court should grant the motion for preliminary injunction. Alternatively, plaintiff asks the court to set an expedited schedule for discovery and summary judgment so that a ruling on the constitutionality of the law may be realized as quickly as possible.

### IV. *Discussion.*

 Plaintiff correctly points out that when an alleged constitutional right is involved, most courts, including the Tenth Circuit, hold that no further showing of irreparable injury is necessary. *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001). Based on that doctrine, plaintiff argues the Magistrate's finding of no showing of irreparable harm is based on an error law.

Even assuming the Magistrate's conclusion on irreparable harm was error,[3] the court concludes the motion for preliminary injunction should be denied for other rea-

sons. Plaintiff claims for purposes of the instant motion that the Kansas law is invalid—not because it has the *effect* of placing a substantial obstacle in the path of a woman seeking an abortion—but because the legislature's *purpose* was to create such an obstacle. Doc. 4 at 7–8, n. 1. Although plaintiff's complaint does challenge the effect of the law, the instant motion is based solely on the Act's asserted unlawful purpose, not its effect. Perhaps for that reason, plaintiff has not provided much in the way of an evidentiary record in support of the motion. After reviewing all of the materials of record, and having listened to the arguments of counsel before the Magistrate,[4] the court concludes plaintiff has failed to show that it is likely to prevail on the merits of this "invalid purpose" claim.

### A. *Legal Framework.*

 A brief review of the framework of abortion law is necessary to address the claim. It is a constitutional liberty of a woman in this country to have some freedom to terminate her pregnancy. *Planned Parenthood of Southeastern Penn. v. Casey*, 505 U.S. 833, 869, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). In short, prior to the viability of her fetus, a woman has a right to choose to terminate her pregnancy. *Id.* at 870, 112 S.Ct. 2791. States, meanwhile, have a legitimate and

---

**3.** The absence of any specific circumstances or facts surrounding the claims of plaintiff's members makes it difficult to say there is a clear showing of imminent injury—one with a clear and present need for equitable relief. The schedule for this motion was largely driven by plaintiff's allegation that one of its members would lose insurance coverage on October 1, 2011. But plaintiff has presented no specific facts concerning that member or her insurance coverage. For example, it is unknown whether it would be a financial difficulty for this member to pay for an abortion if the need arose, whether an insurance rider is available to her from her insurance

company or from some other company, and the cost of any such alternative coverage. Moreover, nothing in the record discloses whether, if the court were to issue the requested injunction, this member's insurance company would continue to provide abortion coverage as part of the comprehensive health policy currently issued to her. The same is true with respect to plaintiff's other members.

**4.** The court listened to a recording of the arguments that was made available through the court's computer system.

important interest in protecting the potentiality of human life—an interest recognized in *Roe v. Wade* that "has been given too little acknowledgment and implementation by the [Supreme] Court in its subsequent cases." *Id.* at 871, 112 S.Ct. 2791. At any stage of pregnancy, a State may further that interest by enacting rules and regulations to ensure that the choice to terminate a pregnancy is thoughtful and informed. *Id.* But prior to viability of the fetus, a State regulation is invalid *if it has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion.* *Id.* at 877, 112 S.Ct. 2791. "A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it. And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Id.* Subsequent to viability, on the other hand, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate and even proscribe abortion, except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother. *Id.* at 879, 112 S.Ct. 2791.

 *Casey* observed that numerous forms of state regulation might have the incidental effect of increasing the cost or decreasing the availability of medical care, whether for abortion or any other medical procedure. *Id.* at 874, 112 S.Ct. 2791. "The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it. Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause." *Id.* Thus, "[r]egulations which do no more than create a structural mechanism by which the State, ... may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose." *Id.* at 877, 112 S.Ct. 2791.

 One other line of authority—the public funding cases—sheds some further light on the nature of the abortion right. In *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), the Court clarified that the right recognized in *Roe* was not an unqualified constitutional right to an abortion, but a right that protects a woman from unduly burdensome interference by the State with her freedom to decide whether to terminate her pregnancy. That right "implies no limitation on the authority of a State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds." *Id.* at 474, 97 S.Ct. 2376. Thus, *Maher* found it permissible for the state and federal governments to subsidize the medical expenses of childbirth for indigent women under the Medicaid program, but to prohibit the use of such funds for abortion services. Such a regulation, the Court said:

> [p]laces no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion. An indigent woman who desires an abortion suffers no disadvantage as a consequence of [the State's] decision to fund childbirth; she continues as before to be dependent on private sources for the services she desires. The State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it

has imposed no restriction on access to abortions that was not already there. The indigency that may make it difficult—and in some cases, perhaps, impossible—for some women to have abortions is neither created nor in any way affected by [the State] regulation. *Id.* at 474, 97 S.Ct. 2376. The regulation thus did not impinge on the right recognized in *Roe v. Wade.*

As noted above, *Casey* said a law in this context is invalid if it has the *purpose or effect* of creating a substantial obstacle to abortion. Plaintiff only challenges the purpose of the law in this motion, arguing the following shows a legislative purpose to create a substantial obstacle. The bill itself was passed in a legislative session that included passage of several other bills regulating abortion. One of those bills was enjoined by a judge of this court based on a preliminary finding that it was passed for the improper discriminatory purpose of preventing Planned Parenthood from receiving federal family planning money because of that group's association with abortion care. *See Planned Parenthood v. Brownback,* 799 F.Supp.2d 1218, 1234–35, 2011 WL 3250720, *15 (D.Kan., Aug. 1, 2011). The court notes that in the *Planned Parenthood* case, the evidence of the act's improper purpose included: a statement by the sponsor of the legislation, on the House floor that the purpose of the bill was in fact simply to take away funds from Planned Parenthood; a showing that the act directly contradicted federal law governing use of the funds; and the state's asserted explanation for the law did not withstand simple scrutiny, leading the court to conclude that it was a *"post-hoc,* 'litigation-spawned' attempt to find some alternative, benign rationale." *Id.* at 1230, at *10. A second bill passed in the same session was likewise enjoined by a judge of this court, based upon a finding that licensing requirements imposed upon abortion clinics were likely unconstitutional. *Hodes & Nauser, MDs, P.A. v. Moser,* No. 11–2365–CM, 2011 WL 4553061 (D.Kan. 2011). A third law imposed a ban on certain abortions after 20 or 22 weeks, which plaintiff argues is contrary to the standard in *Casey.* H.B. 2218, 84th Leg. (Kan. 2011). In addition to the passage of these other acts, plaintiff argues that the Act's restrictions on insurance coverage cannot be justified by the state's interest in potential life, because the Supreme Court has said such an interest may only be furthered by informing the woman's free choice, not hindering it. Likewise, it argues, the state's interest in protecting maternal health is actually undermined rather than furthered by this law, because the law takes away insurance coverage for abortions that are necessary to protect a woman's health. Plaintiff argues that the Act does not serve any valid governmental purpose, but simply puts obstacles in the path of women seeking abortions, making it unconstitutional. Doc. 4 at 11. "In sum, it is clear from the Act's text and legislative context, and from the fact that the Act does not serve a valid governmental interest, that the Act serves no purpose but to make abortions more difficult [to obtain]." *Id.* Plaintiff argues that the law fails even under a "rational basis" standard of review, because it does not further any legitimate governmental interest. *Id.* at 12. Moreover, plaintiff argues that the law violates the right to equal protection, because it allows men to buy comprehensive policies covering all of their health needs, but prohibits women from doing the same. *Id.* at 13.

#### B. *Legislative Purpose.*

In *Jane L. v. Bangerter,* 102 F.3d 1112 (10th Cir.1996), the Tenth Circuit (with this judge on the panel) struck down a Utah law based in part on what the court

found was "the Utah legislature's intent ... to provide a vehicle by which to challenge *Roe v. Wade* [410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)] as demonstrated by the legislature's establishment of an abortion litigation trust account," as well as by enactment of a law that directly contradicted Supreme Court precedent. *Id.* at 1116. The State conceded in that case that the Act was intended to prevent nontherapeutic abortions of nonviable fetuses after 20 weeks, contrary to *Casey's* holding that a woman has a right to terminate her pregnancy prior to viability. *Id.* at 1117. The court further found the law was invalid because it had an impermissible effect—namely, it not only created a substantial obstacle to obtaining a pre-viability abortion but in fact provided an outright ban, clearly contravening *Casey.* *Id.*

 A legislative purpose to accomplish a constitutionally forbidden result may be found when that purpose was " 'the predominant factor motivating the legislature's decision.' Such a forbidden purpose may be gleaned both from the structure of the legislation and from examination of the process that led to its enactment." *Jane L.*, 102 F.3d at 1116 (*citing Armstrong v. Mazurek*, 94 F.3d 566, 567 (9th Cir.1996) [additional citations omitted]).

The *Mazurek* case cited above eventually reached the Supreme Court. In that case, the Montana legislature passed a law requiring that all abortions be performed by a physician. Although a district court denied a preliminary injunction after finding a lack of evidence that the law had the effect of creating a substantial obstacle to women seeking abortions, a court of appeals reversed based on its finding that the purpose of the law may have been to create such an obstacle. *See Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997). Some evidence suggested the law was intended to restrict the activities of one particular physician's assistant who performed abortions and who was targeted by anti-abortion activists. *See Id.* at 979–80, 117 S.Ct. 1865 (Stevens, J. dissenting). Also, two other provisions in the same Act were re-enactments of provisions previously held unconstitutional. *Id.* Finally, the bill itself was drafted by an anti-abortion group. *Id.* at 973, 117 S.Ct. 1865. Despite this background, the Supreme Court vacated the court of appeals' ruling, stating as follows:

The Court of Appeals never contested this District Court conclusion that there was "insufficient evidence" in the record that the requirement posed a " 'substantial obstacle to a woman seeking an abortion.' " Instead, it held that the physician-only requirement was arguably invalid because its purpose, according to the Court of Appeals, may have been to create a substantial obstacle to women seeking abortions. 94 F.3d, at 567. But even assuming the correctness of the Court of Appeals' implicit premise-that a legislative purpose to interfere with the constitutionally protected right to abortion without the effect of interfering with that right (here it is uncontested that there was insufficient evidence of a "substantial obstacle" to abortion) could render the Montana law invalid-there is no basis for finding a vitiating legislative purpose here. We do not assume unconstitutional legislative intent even when statutes produce harmful results, see, e.g., *Washington v. Davis*, 426 U.S. 229, 246, 96 S.Ct. 2040, 2050–2051, 48 L.Ed.2d 597 (1976); much less do we assume it when the results are harmless. One searches the Court of Appeals' opinion in vain for any mention of any evidence suggesting an unlawful motive on the part of the Montana Legislature. If the motion at issue here were a defendant's motion for summary judgment,

and if the plaintiff's only basis for proceeding with the suit were a claim of improper legislative purpose, one would demand some evidence of that improper purpose in order to avoid a nonsuit. And what is at issue here is not even a defendant's motion for summary judgment, but a plaintiff's motion for preliminary injunctive relief, as to which the requirement for substantial proof is much higher. "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."

*Id.* at 972, 117 S.Ct. 1865 [citation omitted]. The Court noted that the physician-only requirement was itself consistent with Supreme Court precedent. *Id.* at 973, 117 S.Ct. 1865. It said the fact that an anti-abortion group drafted the law "says nothing about the legislature's purpose in passing it." *Id. Mazurek* also clarified that such a law is not invalid for an improper purpose unless the record supports a conclusion that the legislature's "predominant motive" was to create a substantial obstacle to abortion. *Id.* at 974, n. 2, 117 S.Ct. 1865.

▮ Under the foregoing standard, plaintiff has failed to cite evidence to show that the Kansas legislature's predominant motive in enacting this particular law was to create a substantial obstacle to abortion. Plaintiff argues the law has only a single purpose—to create such an obstacle. But defendant has cited various interests allegedly furthered by the law. Among other things, it contends the law furthers the state interest of lowering insurance costs, and that it is a "freedom of conscience" provision that prevents Kansas citizens who object to abortion from having their insurance premiums used to fund certain abortion services. It asserts that what the "law really does is eliminate[ ] the subsidy that other participants in health insurance plans have been paying for the costs of abortions for those participants who actually choose to have an abortion." Doc. 14 at 25. Defendant contends the nature of insurance policies and the pooling of premiums and risk pools makes insurance comparable to the "public fund" cases, which say that a State can promote childbirth and elect to not to fund abortion, or to laws concerning conscientious objection to the use of mandatory union dues. Doc. 14 at 15–18. Although defendant cites no authority upholding such a view, neither has this particular argument been directly tested or foreclosed by the Supreme Court.[5] In support of its argument, defen-

---

5. Plaintiff accurately points out that the instant challenge involves insurance policies funded entirely with private rather than public funds. Several courts have addressed similar laws. In *National Educ. Ass'n of Rhode Island v. Garrahy*, 779 F.2d 790 (1st Cir. 1986), the First Circuit agreed with a district court ruling that such a law violated the right recognized in *Roe v. Wade.* The district court, relying upon detailed evidence concerning the effect of the law on the cost and availability of health insurance, and applying strict scrutiny analysis, found the law would have a significant impact on many women's right to choose abortion. *See National Educ. Ass'n of Rhode Island v. Garrahy,* 598 F.Supp. 1374, 1378 (D.R.I.1984). The judge further found that the law's stated objective of discouraging abortion and encouraging childbirth was impermissible. *Id.* at 1385. *See also American College of Obstetricians and Gynecologists v. Thornburgh,* 737 F.2d 283 (3rd Cir.1984) (insurance restriction adds a barrier to obtaining abortion; state's asserted interest in lowering insurance costs impinges on a fundamental right and cannot withstand strict scrutiny). The Eighth Circuit found summary judgment should not have been granted to a plaintiff who "introduced no evidence that insurance policies covering elective abortions are unavailable or prohibitively expensive" as a result of the law, and where the state claimed the law rationally furthered a legitimate governmental purpose of "reducing the cost of

dant also points out that the new federal health care law—the Patient Protection and Affordable Health Care Act—has a similar arrangement. It establishes ground rules for qualified health plans to be offered on State "exchanges," and specifically provides that "a State may elect to prohibit abortion coverage in qualified health plans offered through an Exchange...." 42 U.S.C. § 18023(a). The federal law has a mechanism for segregating costs and premiums for abortion services related to such policies. *See id.* The federal law was accompanied by a Presidential Executive Order, which states that the federal health care law "maintains current Hyde Amendment restrictions governing abortion policy and extends those restrictions to the newly created health insurance exchanges," since policies on such exchanges may be paid for in part by tax credits or government subsidies. The Kansas law pertaining to calculation of a separate premium for an abortion rider appears to draw heavily from the federal law. The same law challenged in the instant motion also has a provision prohibiting policies on Kansas health insurance exchanges from providing coverage for elective abortions. Of course, none of this insulates the law from *Casey's* rule that the state cannot create a substantial obstacle to a woman's right to obtain a pre-viability abortion. But it does weigh against plaintiff's contention that the sole

purpose of this Act was to impermissibly create a substantial obstacle to abortion.

Whether one agrees or disagrees with this asserted cost and/or "freedom of conscience" rationale, there is nothing in the record to show that this was not the legislature's purpose in adopting the law. Moreover, the claimed interests are rational ones that do not necessarily manifest a legislative purpose to create a substantial obstacle to obtaining an abortion. The Kansas law governs the issuance and structure of insurance policies, a matter on which the states traditionally have broad authority, and on its face the Act does nothing to directly prohibit or restrict a woman from obtaining an abortion. Whether the practical *effect* of the law is to actually create a substantial obstacle is another question, but plaintiff has not attempted in this motion to put on evidence to establish such an effect, and the court expresses no opinion here on that question. Insofar as the purpose of the law is concerned, the likely effect of it is not so self-evident that it must be said to manifest a legislative intent to obstruct the right to abortion.[6]

■ Where a law can be viewed as having a rational purpose other than simply obstructing the right to abortion, the court cannot presume that an invalid purpose actually motivated the legislature to adopt the law, let alone that the invalid purpose was the legislature's predominant motive.[7] *See Karlin v. Foust,* 188 F.3d

---

insurance and in protecting the interests of citizens who object to subsidizing abortions through payment of their insurance premiums." *Coe v. Melahn,* 958 F.2d 223 (8th Cir.1992).

6. The briefs disclose that four or five other states have similar restrictions on private insurance policies, with several of those laws having been in effect for over 25 years. There is no evidence in the record concerning the effect of those laws on a woman's right to choose an abortion.

7. The court rejects plaintiff's suggestion that *any* State interest other than protecting the potentiality of human life or maternal health necessarily renders a state law concerning abortion invalid. *Casey* observed that a statute which, "while furthering the interest in potential life *or some other valid state interest,* has the effect of placing a substantial obstacle in the path of a woman's choice" cannot be considered a permissible means of serving its legitimate ends. *Casey,* 505 U.S. at 877, 112 S.Ct. 2791. *Casey* does not limit the state

446, 493 (7th Cir.1999) ("While a plaintiff can challenge an abortion regulation on the ground that the regulation was enacted with an impermissible purpose, the joint opinion in *Casey* and the Court's later decision in *Mazurek* ... suggest that such a challenge will rarely be successful, absent some sort of explicit indication from the state that it was acting in furtherance of an improper purpose."). *Cf. Miller v. Johnson,* 515 U.S. 900, 916, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (" '[D]iscriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' ... its adverse effects") [citation omitted]. That is particularly true where the record before the court lacks any evidentiary showing that the law actually has the effect of creating a substantial obstacle to obtaining an abortion. *Cf. Mazurek.* And like *Mazurek,* the mere fact that the legislature passed other provisions of dubious constitutional validity does not speak to the legislative purpose in adopting this provision. The court concludes plaintiff has failed to show that it is likely to prevail on its claim that Section 8(a) of the Act was predominantly motivated by an unconstitutional legislative intent to create a substantial obstacle to a woman's right to choose abortion.

As for plaintiff's claim that the Kansas law also violates its members' right to equal protection of the laws, the court agrees with defendant that such a claim is likely subject to review under a rational basis test, and that plaintiff has failed to show a likelihood of prevailing on that claim as well. *Cf. Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 113

S.Ct. 753, 122 L.Ed.2d 34 (1993) (opposition to abortion is not class or gender-based discrimination). The law appears to rationally further a state interest in allowing the State's citizens to avoid paying insurance premiums for services to which they have a moral objection. Lest there be any confusion from this finding, the court reiterates that such state interests cannot justify the law if the actual effect of it is to create a substantial obstacle to a woman's right to choose abortion. But the plaintiff has not made that claim in this motion, nor has it provided evidence to support such a finding, and the requested injunction must therefore be denied.

### C. Request for Leave to File Additional Evidence.

 Plaintiff argues it should be allowed to "cure" the evidentiary defect identified by the Magistrate Judge by filing a declaration from its member who will lose insurance coverage on October 1, 2011. But as the Magistrate noted, the briefing and hearing schedule was set up to accommodate the plaintiff, and plaintiff cites no reason why it could not have presented such evidence in a timely fashion that would have allowed the defendant an opportunity to address it at the hearing. Moreover, Plaintiff's motion for preliminary injunction was based upon the allegedly improper purpose of the legislature in passing the Act. Doc. 4 at 5–7, & n. 1 ("[P]laintiff's claim focuses on the Act's unlawful *purpose,* not its effect, and thus *Coe* has no bearing on Plaintiff's claims."). Plaintiff has not explained how supplementing its evidence with a declaration from one of its member would relate to that claim. Accordingly, the court will deny plaintiff's request to supplement its

---

interests that could underlie all state regulations touching on abortion; it makes clear that no matter what state interest is involved,

it is impermissible for the state to further its interest by creating a substantial obstacle to pre–viability abortions.

evidence. The court notes, however, that the denial of the instant motion is without prejudice. Nothing in this court's ruling precludes plaintiff from filing a subsequent motion for preliminary injunction if it can meet all of the prerequisites for such a motion, nor does it constitute a final ruling on the merits of plaintiff's claims.

### D. *Discovery & Scheduling.*

Plaintiff requests that if the court denies the instant motion, it set an expedited schedule for discovery and summary judgment, so that the Act's constitutionality and its effect on the rights of plaintiff's members may be promptly determined. That request is well-taken; the court will direct the Magistrate to set an expedited schedule for discovery and dispositive motions.

### V. *Conclusion.*

The court adopts the Recommendation of the Magistrate Judge, albeit for different reasons than relied upon by the Magistrate. Accordingly, Plaintiff's Motion for Preliminary Injunction (Doc. 3) is DENIED. Plaintiff's Objection to the Report and Recommendation is denied as moot.

The court directs the Magistrate Judge to set an expedited schedule for discovery and the filing of dispositive motions.

### REPORT & RECOMMENDATION ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

KENNETH G. GALE, United States Magistrate Judge.

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction (Doc. 3). The motion and its attendant evidentiary hearing were referred to the Magistrate Judge for the preparation of a Report & Recommendation concerning the disposition of the motion in accordance with 28 U.S.C. § 636(b)(1)(B). The Magistrate Judge has reviewed and considered briefing by both parties, and has considered evidence (consisting of two sworn declarations submitted by Plaintiff and a short joint stipulation of the parties) and argument from the parties at an evidentiary hearing held on September 16, 2011. Because the Plaintiff has presented insufficient evidence that its members will likely suffer irreparable harm during the pendency of this action, the Magistrate Judge **recommends** that the Motion for Preliminary Injunction be **DENIED.**

### BACKGROUND

Plaintiff American Civil Liberties Union of Kansas and Western Missouri (Plaintiff or ACLU) is an affiliate of the national American Civil Liberties Union with more than 3,300 members in Kansas and Western Missouri. (Doc. 15, at ¶ 1, 2.) Plaintiff brought this action against Sandy Praeger in her official capacity as the Kansas Insurance Commissioner to challenge the constitutionality of a new Kansas Law, House Bill 2075 ("the Act").[1] As Insurance Commissioner, Ms. Praeger is responsible for the enforcement of the Act. (Doc. 15, at ¶ 3.)

The challenged provision at issue here applies to individual and group health insurance policies, and like programs. The portion of the Act at issue reads as follows:

> New Sec. 8. (a) Any individual or group health insurance policy, medical service plan, contract, hospital service corporation contract, hospital and medical service corporation contract, frater-

---

1. Although Plaintiff also challenges Section 8(b) of the Act, which limits abortion coverage in policies participating in the health care exchange, the parties have stipulated that Plaintiff is not seeking to preliminarily enjoin that provision. (Doc. 15, at ¶ 11.)

nal benefit society or health maintenance organization, municipal group-funded pool and the state employee health care benefits plan which is delivered, issued for delivery, amended or renewed on or after July 1, 2011, shall exclude coverage for elective abortions, unless the procedure is necessary to preserve the life of the mother. Coverage for abortions may be obtained through an optional rider for which an additional premium is paid. The premium for the optional rider shall be calculated so that it fully covers the estimated cost of covering elective abortions per enrollee as determined on an average actuarial basis.

HB 2075. The Act defines "elective abortion" as "an abortion for any reason other than to prevent the death of the mother upon whom the abortion is performed; provided, that an abortion may not be deemed one to prevent the death of the mother based on a claim or diagnosis that she will engage in conduct which will result in her death." *Id.* HB 2075 was signed into law by Governor Brownback on May 25, 2011, and became effective on July 1, 2011.

The parties stipulate that women seek abortions for reasons beyond those that are necessary to save the life of the mother. (Doc. 15, at ¶ 4.) For example, in some instances, a woman who is in the process of miscarrying needs medical treatment to complete the termination of the pregnancy. (Doc. 15, at ¶ 5.) The decision to have an abortion may arise from many circumstances, including the termination of an unwanted pregnancy or a decision after complications from an intended pregnancy result in medical complications and health risks to the mother or fetus. (*See generally,* Doc. 4–1, Declaration of David L. Eisenberg, M.D.)

Prior to the Act going into effect, some insurance companies in Kansas offered insurance policies that covered elective abortions in their comprehensive plans without a separate rider or premium. (Doc. 15, at ¶ 6.) As a result of the Act, women who formerly had insurance coverage for abortion will have to pay more for abortion care. (Doc. 15, at ¶ 7.) The cost for abortions in clinics in Kansas is between approximately $470 early in pregnancy to approximately $1,500 later on—and that the cost tends to increase as the pregnancy advances. (Doc. 15, at ¶¶ 8–9.) Hospital-based abortions are generally more costly than those performed in clinics and can cost thousands of dollars. (Doc. 15, at ¶ 10.)

Plaintiff claims that the Act violates the Due Process Clause, including the right to privacy and liberty in the fourteenth amendment, while also violating the Equal Protection guarantees inherent in the Due Process guarantees of the Fourteenth Amendment. Plaintiff requests a declaration that the Act is unconstitutional, and requests preliminary and permanent injunctive relief prohibiting Defendant (and the State of Kansas) from enforcing the Act.

In its Motion for Preliminary Injunction, Plaintiff requests an Order prohibiting the State from enforcing the Act during the pendency of this action. (Docs. 3, 4; *see also* Doc. 15, at ¶ 12.) Plaintiff claims that its members have lost or will lose insurance coverage because of the application of the Act, including a member who will lose coverage upon the renewal of her policy on October 1, 2011. Defendant denies that the Act is unconstitutional, and claims that the Act was passed for a valid purpose.

## *DISCUSSION*

### A. Standard for Preliminary Injunction.

The limited purpose of a Fed.R.Civ.P. 65 preliminary injunction is "merely to pre-

serve the relative positions of the parties until a trial on the merits can be held." *University. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). Because "a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Schrier v. University of Colo.*, 427 F.3d 1253, 1258 (10th Cir.2005). A party requesting a preliminary injunction must establish that: "(1) [he or she] will suffer irreparable injury unless the injunction issues; (2) the threatened injury ... outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood [of success] on the merits." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir.2003).

**B. Irreparable Injury.**

In the analysis of these factors, courts consistently hold that "[b]ecause a showing of **probable irreparable harm is the single most important prerequisite** for the issuance of a preliminary injunction, **the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.**" *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990) (emphasis added); *see also Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir.2004).

▬ Based on the evidence presented—and arguments advanced—by the parties, the essential, preliminary question in the Court's analysis is whether Plaintiff has met the irreparable harm standard.

'To constitute irreparable harm, an injury must be certain, great, actual 'and not

theoretical.' ' Irreparable harm is more than 'merely serious or substantial' harm. **This requirement is met by a plaintiff demonstrating that there is a significant risk of harm that cannot be cured by monetary damages.** The party seeking the preliminary injunction bears the burden to show that 'the injury complained of is of such imminence that there is a clear and present need for equitable relief.' **Irreparable harm is the most important factor in obtaining a preliminary injunction....** [W]holly conclusory statements alone will not constitute irreparable harm.

*Id.* (internal citations omitted) (emphasis added).

Plaintiff must establish that *its members* will suffer an irreparable harm, not that harm will result to the general citizenry. Plaintiff argues that a violation of its members' constitutional rights, even temporarily, amounts to irreparable injury. (Doc. 4, at 16) (*citing Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1235 (10th Cir.2005)). At argument, Defendant did not dispute this general proposition. Plaintiff's claim for that injury in its brief is, in its entirety: "Plaintiff's members' constitutional rights will be lost absent an injunction. For example, some members have already lost coverage, and another member is set to lose coverage October 1, 2011. Accordingly, all members who are losing coverage will be irreparably harmed." (See Doc. 4 at 16 (internal citation omitted).) [2]

In support of this claim, Plaintiff presents a sworn declaration from its Program Director. The portions of that declaration

---

**2.** The Court could not, even with a preliminary injunction, prevent the claimed harm to

members who have already lost coverage.

offered to support the claim of irreparable harm are:

3. The ACLU has members who will lose, and members who have already lost, their insurance coverage for abortion because of the Act. Some members are unable to purchase a rider to their policy to cover abortions because some insurance companies have not made such riders available.

4. Some members have already lost their insurance coverage for abortion. Others will lose coverage once their policies are renewed. For example, one member will lose coverage October 1, 2011, when her policy is renewed.

5. Some ACLU members who have lost or will lose abortion coverage because of the Act would consider abortion for any one of a number of reasons were they to become pregnant, including that they are not ready to parent, that may become pregnant as a result of rape, or may experience complications related to their pregnancies.

6. For some ACLU members who will lose insurance coverage for abortion because of the Act, paying for an abortion would impose financial difficulties.

(Doc. 4–2). The declaration contains no foundation information of any kind. The Court is unable to ascertain how the Program Director arrived that the general conclusions made or collected the information.

▆ Plaintiff has the burden of establishing irreparable injury in support of its Motion for Preliminary Injunction. *Paramount Pictures Corporation v. Video Broadcasting Systems. Inc.,* 724 F.Supp. 808 (D.Kan.1989). A hearing on such a motion uses procedures that are "less formal and use evidence that is less complete than a trial on the merits." 451 U.S. at 395, 101 S.Ct. 1830. A court may consider sworn statements. However, a court should be "wary of issuing an injunction based solely upon allegations and conclusory affidavits." *Atari Games Corp. v. Nintendo of America, Inc.,* 897 F.2d 1572, 1575 (Fed.Cir.1990). In some jurisdictions, it is considered inadvisable to issue an injunction based on affidavits alone. *See People ex rel. Hartigan v. Peters,* 871 F.2d 1336 (7th Cir.1989).

As stated at the hearing, the Court has serious concerns regarding the very general statements in the sworn declaration of Holly Weatherford, the Program Director for the ACLU. (Doc. 4–2.) Even more concerning, however, is the absence of any foundation for Ms. Weatherford to make these statements.

"Establishing foundation is the process whereby a proponent of a piece of evidence identifies or authenticates the evidence, usually with the testimony of a witness." *Sheets v. Salt Lake County,* 45 F.3d 1383, 1390 (10th Cir.1995) (citing Edward W. Cleary, McCormick on Evidence § 51, at 123 (3d ed. 1984)). The only foundation information in Ms. Weatherford's declaration is contained in paragraph 2, stating that she is the Program Director for Plaintiff. There is no discussion of what that position entails or the information to which the position makes her privy. Further, there is no discussion of the relationships, knowledge, and/or interaction—or level thereof—she has with Plaintiff's members. As a result, the Court has no information that would allow it to determine whether or not she is qualified to authenticate the facts she is propounding.

This concern is not mere form over substance. While the Plaintiff's challenge is to the Act's *purpose,* the irreparable

harm inquiry must focus on the *likely effect* of the Act on the Plaintiff's members. If the Act's purpose [3] is to create an undue burden on plaintiff's members' right to choose to terminate pre-viable pregnancies, the Act is unconstitutional. *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). "Abortion is customarily chosen as an unplanned response to the consequence of unplanned activity or to the failure of conventional birth control." *Id.*, at 856, 112 S.Ct. 2791. Thus, like other unplanned medical conditions, a women's access to care may be burdened by the lack of insurance. An explanation of how the Act, which requires the issuance of separate riders for abortion coverage, will likely result in the loss of insurance to Plaintiff's members who may require the procedure—with foundation for those claims—is lacking. Because the Act may leave women in the position of paying for their own care, the cost of the care relative to the financial ability of the woman is relevant—perhaps critical—to the irreparable harm inquiry. However, the general statement in the declaration that the Act will impose "financial difficulties" on some members is not a conclusion to which the Court can subscribe without further support.

Certainly, the Court may take into account the circumstances surrounding the application for preliminary injunction and the hearing. While this hearing was expedited at Plaintiff's request, it was not conducted as an emergency. Plaintiff filed this action after the Act was in already in effect to prevent its further application. The hearing date of September 16 was set to accommodate Plaintiff's concerns about its unidentified member who will allegedly lose her insurance coverage on October 1. The evidentiary hearing was set on August 26 (Doc. 10), three weeks before the hearing. Plaintiff's Motion was filed a month prior to the hearing. Plaintiff has not claimed an inability to provide evidentiary support for the general conclusions in the declaration.[4] Because Plaintiff has failed to present evidence sufficient to establish its "clear and unequivocal right to relief," the motion must fail.

**IT IS THEREFORE RECOMMENDED** that the District Court **DENY** Plaintiff's Motion for Preliminary Injunction. (Doc. 4.) Pursuant to 28 U.S.C. § 636(b)(1), Fed.R.Civ.P. 72, D.Kan. Rule 72.1.4, and the previous order of this Court (*see* Doc. 10), Plaintiff shall have until September 26, 2011, to serve and file with the U.S. District Judge assigned to the case, its written objections to the findings of fact, conclusions of law, or recommendations of the undersigned Magistrate Judge. Plaintiff's failure to file such written, specific objections within the fourteen-day period will bar appellate review of the proposed findings of fact, conclusions of law, and the recommended disposition.

**IT IS THEREFORE ORDERED AND RECOMMENDED.**

---

3. Plaintiff's claim is that the Act was passed with an unconstitutional purpose. For this motion, Plaintiff has not claimed that the Act has the unconstitutional effect of creating an undue burden to a woman's choice. (Doc. 4, n. 1).

4. When the Court expressed its concern about the quality of the evidence at the hearing, Plaintiff asked to file a supplemental affidavit. In fairness to Defendant, which had prepared its response and presentation in reliance on the evidence presented and facts to which the parties had stipulated, the Court denied the request.